## Walsh, Appellant, *v.* Lockhart Iron and Steel Company.

468

Argued May 7, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Samuel M. Rosenzweig*, for appellant.

*J. Stanton Carson*, with him *J. Merrill Wright*, of *Wright & Rundle*, for appellee.

OPINION BY STADTFELD, J., July 18, 1935:

This is a workmen's compensation case. The referee made an order refusing compensation, and upon appeal to the Board the referee's findings of fact and conclusions of law were reversed and compensation was

awarded. From the order of the Board an appeal was taken to the Common Pleas Court of Allegheny County, which sustained the appeal in an opinion by GARDNER, J., reversed the action of the Board, and entered judgment for the defendant. From this judgment of the court below, this appeal is taken by claimant.

The following excerpt from the opinion of the lower court, states the facts which do not seem in dispute: "The alleged accident occurred on October 24, 1933, and claimant's deceased husband, John M. Walsh, was employed by the Lockhart Iron and Steel Company as a puddler in their manufacturing plant located at McKees Rocks, Pa. In general, Walsh's duties as a puddler were to tend the furnace in which iron was in the process of manufacture. On the day of the accident, Walsh appeared to be in good health, and ate a substantial breakfast about 8:30 A. M. He reported for work at two o'clock in the afternoon. It was customary for his wife to prepare lunch for him before he went to work, or to supply him with sandwiches, but on this particular day the deceased told his wife he did not desire any lunch.

"The place where the deceased worked was well lighted, and had a solid cinder floor. There were no machinery, loose tools or other objects on or about the floor. Next to the furnace was a box containing water, called a 'bosh,' in which the puddlers would throw their hot tools for the purpose of cooling them. About three feet from the bosh and a little farther out from the furnace was a box called an 'ore box' or 'fix box,' which had sides 18 inches high at the back and away from the furnace and six inches high at the front or side nearest the furnace. The sides were sloped from the six-inch front to the eighteen-inch rear. This box was made of iron, and its contents was a mortar about the consistency of putty, used for lining the furnace. Walsh and his co-worker, Kenny, worked on the same

furnace, alternating in fifteen minute spells. About four o'clock in the afternoon of October 24, 1933, the deceased had just finished working a fifteen-minute spell and had been relieved by Kenny. George W. Herbert, in charge of the engine operating the mill, and John J. Ryan, boss over puddlers, and the immediate superior of both the deceased and Kenny, were at this moment seated on a bench about fifteen feet from the fix box. The deceased was in their direct line of vision, and they were eye-witnesses to every movement made by him from the time he finished his spell until he died a few moments later.

"It appears from their testimony that Walsh, in view of both these men, left the furnace, walked over to the bosh, picked up a can, dipped it into the bosh so as to fill it with water and walked toward the fix box. It was customary for puddlers to throw water from time to time into the fix box so as to render the substance therein more plastic. Walsh stood for an instant with his arms in the position preparatory to throwing the water upon the fix, and without an instant's warning his legs collapsed under him and he slumped or sank to the floor. As he slumped his head went forward so that his body came to a position of rest he was lying face down with his head in the fix box. Ryan and Herbert rushed over to assist him and were later joined by Kenny, who had not, however, been watching the deceased at the time he slumped and fell. They immediately turned Walsh over and felt for pulse or heart movement, and, finding none, made some attempt at resuscitation, although Ryan at least was convinced Walsh was then dead.

"Dr. Tannehill, the plant doctor, having been called, arrived within ten or fifteen minutes and ascertained that Walsh was dead. He made a thorough examination, going over him from head to foot, feeling and palpating, and found no broken bones or fractures and

no marks whatsoever except a slight laceration one-third of an inch above the left eye brow."

Claimant first agreed that an autopsy should be performed, but after consultation with her brother-in-law and others, she withdrew her consent and no autopsy was ever made. The coroner's inquest found that the cause of death was undetermined.

In the claim petition filed on November 27, 1933, claimant alleged that the decedent while carrying a can fell to the floor and struck his head on the fix box, which blow caused death. Defendant's answer denied that death was the result of an accident occurring in the course of his employment, or that a blow had caused death, but alleged, on the contrary, that the deceased's death was due entirely to heart failure or to a heart attack in no wise related to the duties of his employment.

The sole question before the lower court in this case was whether there was legally competent evidence to sustain the finding and conclusion of the Board that the death of the decedent was due to an accidental injury suffered in the course of his employment. We also are governed by the same rule.

Three witnesses, employees at the same plant, testified substantially to the facts as stated by the lower court. These three witnesses were the only persons who were in the immediate vicinity at the time of the occurrence of Walsh's death. These witnesses testified that they noticed the laceration over the left eye of decedent immediately after his fall and that there was no such cut or laceration apparent before.

Joseph Moran, who embalmed the deceased, testified that decedent had a cut over his left eye which had to be stitched with a single thread; that the embalming fluid leaked through it.

The deceased was a man about 5 feet 10 inches tall and weighing nearly 200 lbs.

Claimant's medical testimony was confined to that of Dr. Ishlon, who had never seen the deceased, Walsh, either before or after his death. This witness, in answer to a hypothetical question as to the cause of the death, answered that he believed death was due to "the accident." On cross-examination, he stated that death would be due to a concussion of the brain, although there was no evidence whatsoever as to any concussion. He further testified that only an autopsy would be able to reveal the cause of death and that he could not state what might have been the cause of decedent's death. He further conceded that he had never heard of death resulting from lacerations or contusions such as suffered by Walsh according to the testimony.

There was testimony that decedent was a very heavy eater and that his wife had repeatedly warned him about overeating before going to work.

It was conceded by all the medical testimony in the case that the exact cause of death could only have been determined by an autopsy. If appellant had wished this to be done, it was in her power to do so, and since she did not the responsibility must rest with her. See Swiderski v. Glen Alden Coal Co., 114 Pa. Superior Ct. 21, 28, 173 A. 865: "Of course, we attach no importance to her statement that her husband died of pneumonia, nor do we find fault with her refusal to permit an autopsy. That was a matter for her, but if by so doing she has prevented the obtaining of evidence which might have supported her claim, the responsibility must rest with her. (Carroll v. Willow Brook Co., 108 Pa. Superior Ct. 580, 165 A. 550)."

From the testimony of the eye-witnesses as to the manner in which the deceased met his death, we believe that there is no evidence to indicate the occurrence of an accident within the meaning of the workmen's compensation act, and from the medical testimony of the doctors both for the claimant and the defendant, we

believe that the competent relevant and material testimony of both physicians shows that whatever cut or laceration was sustained as a result of decedent's collapse itself, had nothing to do with the death of the deceased.

We believe that the instant case is governed by the principles laid down in the case of Gausman v. Pearson Co., 284 Pa. 348, 131 A. 247, where the court said (p. 351) : "Before one ailment can be attributed to another, the existence of the latter must be shown." And further at p. 354: "To constitute an accident there must be some untoward occurrence aside from the usual course of events. ...... Disability, overtaking an employee at his work, is not compensable unless the result of accident. And the burden is on claimant to prove it was such and not from natural causes. ...... Disability, hastened by such exercise, cannot be treated as accidental; neither can death or disability overtaking an employee in the course of his employment and resulting from a natural cause; if it could, it would render the employer an insurer of the life and health of the employee."

As stated in Mooney v. Yeagle, 107 Pa. Superior Ct. 409, 164 A. 82, "The fact that an employee suddenly dies while doing work which calls for no unusual physical strain raises no presumption of an accident."

Disability overtaking an employee while at his work, is not compensable unless the result of accident, and an accident to be within the purview of the Workmen's Compensation Act must be some unexpected or fortuitous event.—McFadden v. Lehigh Nav. Coal Co., 111 Pa. Superior Ct. 501, 170 A. 314. To same effect, Rocco v. Ellsworth Collieries Co., 111 Pa. Superior Ct. 508, 170 A. 316.

It is not necessary to review the numerous cases defining what constitutes an accident under the act. In the very recent case of Lacey v. Washburn & Williams

Co., 309 Pa. 574, 164 A. 724, Mr. Justice DREW has discussed the matter very fully, and has made reference to a number of pertinent cases, and it would serve no useful purpose to repeat what is contained in that opinion. The cases cited by appellant are all readily distinguishable from the instant case.

After a very careful review of the entire testimony, we are of the opinion that there is no legally competent testimony to support the finding by the compensation board that the decedent's death was the result of an accidental injury.

The assignments of error are overruled and the judgment of the lower court affirmed.