Burrell *v.* State Workmen's Insurance Fund et al., Appellants.

Argued April 13, 1937.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*S. H. Torchia,* with him *Charles J. Margiotti,* Attorney General, *John T. J. Brennan,* and *Lawrence F. McGrath,* for appellants.

*P. K. Jones,* with him *T. Robert Brennan,* for appellee.

Opinion by Cunningham, J., July 15, 1937:

The appeal in this workmen's compensation case is by the employer and its insurance carrier from a judgment entered by the court below upon an award of

compensation to the claimant and her dependent daughter.

It is not questioned that Dominic Burrell, claimant's husband, while in the course of his employment as a hoisting engineer with Inland Collieries Company, died suddenly about nine o'clock on the forenoon of January 11, 1935. The issue was whether his death resulted from the natural and normal progress of the chronic arteriosclerosis, accompanied by high blood pressure, for which he had been under treatment for several years, or whether it was the result of an "accident," within the meaning of the Act of June 2, 1915, P. L. 736, occurring during the performance of his duties.

A portion of the fifth finding of the referee reads: "The exact nature of the accident is undetermined, but your referee is of the opinion from all of the evidence that he did sustain an accident which resulted in his death." The question of law with which we are now concerned is whether there is legally competent evidence upon this record to sustain that finding. The court below was of opinion that the referee and board were justified in inferring that death was due to an accidental cause and therefore held that it could not interfere, regardless of whether it would have so found had it been the fact-finding body. A careful examination of the evidence has led us to a different conclusion.

No autopsy was performed and the exact cause of death was therefore not determined. However, the testimony of Dr. Mock, the only physician who examined decedent's body, reads: "Q. Did you make a diagnosis, doctor? A. I was asked to state the cause of death and, not knowing the actual cause of death, short of an autopsy, I took the most probable cause, knowing his physical condition and from the repeated examinations that I previously made, I diagnosed it as probably one of cerebral hemorrhage. Q. Due to what in your opinion, doctor? A. To a natural cause. Q. What

natural cause? A. Would be a bursting of a blood vessel, as far as that was concerned, no one knows the actual cause of the man's death. It could have been any case of sudden death."

In the performance of his duties, raising and lowering cages from the bottom of the shaft to the tipple, the decedent stood, and sometimes sat in a chair, upon a raised and railed off platform in the engine room. The hoisting machinery was operated by electricity. At his left was the control box and upon his right a lever, about four feet in length, by which he operated the brake. When Burrell had this brake lever "in the back position," i. e., pulled toward him, and the "control on neutral," one cage would be at the bottom of the shaft and the other up in the tipple, and the brake would be "off." In order to apply the brake the lever had to be pushed forward and away from the operator. Decedent went to work on the morning of January 11th at his usual time and the hoisting operations continued without any unusual incident until about nine o'clock. A signal was then given to hoist a loaded cage from the bottom of the shaft. When the machinery did not start, James P. Gaines and John R. Douglas, fellow employees of decedent, went to the engine room to ascertain the reason. They found decedent lying on his right side "on his platform that he stood on when hoisting" and unconscious. When found, he was lying between the control box and the left railing, facing away from the lever; the lever was pushed forward and the chair pinned between it and the right railing. They testified they "worked him out from behind" and turned him over on his face in order to start artificial respiration. Gaines, when asked whether he saw any blood, replied: "I noticed in pulling his tongue from his mouth before starting giving him treatment a little blood at the edge of his mouth." Dr. Mock was summoned, pronounced decedent dead and had his body

removed to the mine hospital, where he made a careful examination of the body but "found no laceration, contusion, bruise or mark of any kind."

The whole case for the claimant was built upon the theory that the brake lever "flew back" and struck decedent, causing a sudden increase in his already abnormally high blood pressure and resulting in the rupture of "some vessel or vessels about his brain or about some other parts of his body." It was not controverted that decedent, when examined by Dr. Mock in August of 1933, had arteriosclerosis, with high blood pressure, and a hernia. The hernia was corrected by an operation, but the patient was required to have his blood pressure checked frequently. Although somewhat reduced it was still abnormally high at the last examination, approximately two weeks before his death. Claimant called two physicians, Doctors Snyder and Fleegler. Neither of them saw decedent's body, but Dr. Snyder had operated upon him on February 17, 1934, for the hernia. His testimony agrees with that of Dr. Mock with respect to the high blood pressure.

In the hypothetical questions submitted to the physicians over the objections of counsel for appellants, they were in every instance asked to assume that decedent had sustained a blow upon his face of sufficient severity to cause a bruise. For example, one of the questions asked Dr. Snyder reads: "Doctor, if you had this *bruise* and if you had the fact of high blood pressure *plus the fact that the brake occasionally kicked back,* if there was evidence of trauma on the left side of the face, extending from the eye down to the mouth about an inch and a half wide, what, in your professional opinion, would be the probable cause of his death?" The witness replied, "Well, in answering that question, *taking these facts as stated into consideration,* it would be my opinion that in some way he received a blow to the left side of his face which resulted in a rupture

of — a possible rupture of a blood vessel or blood vessels somewhere in his body." (Italics supplied). An excerpt from his testimony on cross-examination reads: "Q. Well, as far as you know, doctor, this decedent might have died there at his work as a result of cerebral hemorrhage without having sustained an accident, is that true? A. He could have, by having a large or a massive cerebral hemorrhage."

The testimony of Dr. Fleegler, who also saw Burrell while he was in the hospital, was substantially to the same effect, one question and answer reading: "Q. So that you really don't know what the cause of death was in this case? A. It is supposition, based on the facts that have been given to me."

Whether Burrell when found had any bruise upon his face was in controversy; the only testimony that he had was that of his widow and daughter. Claimant testified that when she saw his body shortly after his death she noticed a blue mark, about one and a half inches wide, on the left side of his face and running from the corner of the left eye to the left corner of the mouth. She was contradicted positively by Dr. Mock who said he made a careful examination but found no marks of any kind upon decedent's face or body; the undertaker and seven fellow workmen who saw him immediately after his fall denied there was any bruise upon his face.

If the presence or absence of a bruise upon the left side of decedent's face were a matter of importance and the referee and board, notwithstanding the overwhelming contradiction of claimant, saw fit to believe her testimony, we would be bound by their finding. But if we assume there was a bruise of the character described by claimant, its presence would, in our opinion, be of slight, if any, importance. The only inference deducible from all the testimony would be that it was received in the fall. If it had been caused by

the brake lever kicking or flying back, as suggested, it would naturally have been upon the right side of decedent's face.

The fundamental difficulty with claimant's case is that there is not a syllable of testimony from which any fact-finding tribunal could find that the brake lever "flew back" and struck decedent the morning of his death. Over the objection of counsel for appellants, claimant was permitted by the referee to testify that her husband had told her at some prior time that when the brake gets "real hot it comes right back" and that he had to "watch" himself. She also testified that while she was in the engine room upon some undesignated occasion she saw the lever fly back about one foot. The hearsay testimony relative to decedent's declarations was so clearly inadmissible that it cannot be considered. If the remainder of her testimony be accepted at its face value, it does not afford any basis for a finding that the lever, in fact, flew or kicked back on the morning of January 11, 1935.

Moreover, there is abundant testimony upon this record that the decedent could not have been injured in the manner contended for by the claimant. Ira W. Lacey, who had both operated the hoist and made repairs upon it, testified that when Burrell had the brake lever "in the back position and the control on neutral the east cage is on the bottom of the shaft and the west one is up and the brake is off;" when the lever is pushed forward it puts the brake on. In reply to the question whether the brake worked like an automobile brake the witness, using a photograph of the machinery, replied: "No, it is much different. A brake this weight is pumped up by pressure, which in turn is manipulated from pipes that work on this counter-weight here, by the sliding movement of this lever here, pressure would act as settlement of valves in turn brings this pump down, applying pressure to the drum which retrace

[retards?] the motion of the machine." This witness further stated that if there should be a seepage or failure of power, or excessive speed, or anything wrong with the hoisting mechanism, "the brake would fly to the front rather than to the rear, ...... it would be impossible for it to kick back." Referring to the morning of the accident, he testified his records showed that the power had not been disturbed and that the "graph meter" (which he produced) showed "no power off or any unusual operation of the machine." The machinery was not run again that day but was put in operation the next day without any adjustment or repairs.

We cannot agree with the board in its statement that it was not material whether decedent was struck by the lever "and so flung to the floor or whether he fell off the chair on which he was accustomed to sit while working and sustained the injury in that manner." Obviously, if the fall from the chair was caused by a cerebral hemorrhage due solely to the progress of his disease such a fall would not be an accident within the meaning of the statute. Of course, a claimant may carry the burden of proving a compensable death by the introduction of competent circumstantial evidence but it is essential that circumstances be shown which clearly and logically indicate an accidental death.

One of the cases relied upon by the board is *Zelazny v. Seneca Coal Mining Co. et al.*, 275 Pa. 397, 119 A. 487, in which Mr. Justice WALLING, discussing the conflicting theories advanced in that case as to whether the injuries suffered by the decedent were caused by coming in contact with an electric wire, or an accidental fall upon his head from a coal car, said: "It is immaterial which, for where the death is *accidental* it is not incumbent upon a claimant to show the exact nature of the accident or just how it occurred." (Italics supplied) This language must, of course, be read in connection with the facts in that case. No one saw the decedent

fall from the car, but the writer of the opinion pointed out that the marks upon his person could not be accounted for "upon the theory of death from a natural cause, like heart failure or a stroke," and added that there was no circumstance in the case which pointed to death from a natural cause.

Another case cited by the board is *Horn v. Fitler Co. et al.*, 115 Pa. Superior Ct. 188, 175 A. 440. That case was one in which the fatally injured employee was found lying at the foot of a flight of steps upon the employer's premises; but it was shown that when a fellow employee ran up to him and asked what had happened, he replied,"I fell down the steps."

The case of *Flucker v. Carnegie Steel Co.*, 263 Pa. 113, 106 A. 192, is also cited and relied upon. It is important to have a clear understanding of the facts in that case when it is under discussion. Henry Flucker, the decedent, was working on night turn for the defendant company. It was his duty to look after two pumping stations, 350 feet apart and located upon opposite sides of a ravine about eighteen feet deep and twenty feet wide. To enable its employees to go from one side of the ravine to the other, the company constructed a footbridge, about forty inches wide, with a railing at either side three feet in height; a railway trestle was likewise constructed over the ravine, below the footbridge, which could also be used by pedestrians. The dead body of Flucker was found in the ravine, about eight feet below the footbridge but above the railway trestle, with injuries on the trunk, hands and back of the head; the night in question was exceedingly cold and some snow and ice were on the trestle and ground, but the footbridge had been cleared of them the previous day. From a consideration of all the circumstances, the compensation authorities concluded the deceased "met his death from injuries received by accident occurring in the course of his employment" and

made an award to his widow and children. In upholding the award, our Supreme Court pointed out that verdicts frequently have been sustained in trespass cases upon circumstantial evidence where there had been no eye witnesses to the occurrence, and held that there is no reason why awards should not also be sustained upon circumstantial evidence in proper cases. In the course of the opinion, this language was used: "Where no facts appear indicating anything to the contrary, it may be presumed logically that an employee at his regular place of service, during his usual working hours, is there in discharge of some duty incident to his employment; and, when the dead body of an employee is found on the premises of his employer, at or near his regular place of service, under circumstances fairly indicating an accidental death which probably occurred during the usual working hours of the deceased, the inference may fairly be drawn, in the absence of evidence to the contrary, that the employee was injured in the course of his employment."

The principles announced in the Flucker case have been consistently followed by this court, but the difficulty with the case at bar is that the ultimate and controlling finding is based upon underlying assumptions, unsupported by any competent evidence. It is to be noted that the above quoted rule is predicated upon the finding of the dead body of an employee on the premises of his employer at or near his regular place of service *"under circumstances fairly indicating an accidental death"* and *"where no facts appear indicating anything to the contrary."* Here, as we have pointed out, there were many circumstances indicating death from a natural cause.

*Finnerty v. Hudson Coal Co.,* 113 Pa. Superior Ct. 317, 173 A. 436, cited in behalf of claimant, merely follows the principles announced in the Flucker case. Finnerty, while in the course of his employment as a

watchman, suffered fatal injuries through falling into a hole formed by the caving in of a mine.

*Watkins v. Pittsburgh Coal Co.*, 278 Pa 463, 123 A. 461, is another leading case upon the question with which we are now concerned. There, claimant's husband was working at night for the defendant company in one of its mines. His main work was in the boiler house, but his duty required him to go down each night into the mine pit and look after certain pumps. In order to do so, it was necessary for him to pass down a flight of twelve steps and thence over a level space, traversed by two railroad tracks, to a stairway leading down some eighty feet to the pumps, where he was usually occupied about an hour and a half. On the night in question, he descended into the mine about ten o'clock but did not return; early the next morning his body was found lying near the foot of the twelve steps, between a wall and the first railroad track, with a small cut on his forehead and a slight bruise or scratch on one cheek. No autopsy was held, but a doctor expressed the opinion that death had resulted from acute dilatation of the heart, superinduced by exertion in climbing up the stairs from the mine pit.

In sustaining the award it was held that the record contained competent evidence supporting the conclusion that the employee's death was accidental and caused by over-exertion in climbing eighty feet up a stairway. The writer of the opinion for the Supreme Court also pointed out that the decedent sustained a fall which may have caused death by a brain lesion or some other injury. In short, the Watkins case is one in which all the circumstances tended to support a finding of accidental death.

For the reasons already stated in detail, we are of opinion that the case at bar comes within the class of cases of which *Lesko v. Lehigh Valley Coal Co.*, 270 Pa. 15, 112 A. 768, and *Gausman v. Pearson Co.*, 284 Pa.

348, 131 A. 247, are examples. In the Lesko case, the employee was stricken while engaged in his usual work of breaking rock in one of the defendant's collieries and rendered unconscious and paralyzed on one side as the result of cerebral apoplexy. There was medical testimony to the effect that he was afflicted with an enlarged heart and also arteriosclerosis. Compensation was disallowed because at the time of the cerebral hemorrhage he was performing the kind of work he had been engaged in for some time; there was no unusual happening in the course of his work, or evidence of external violence to his person; nor was there evidence of any sudden, unlooked-for, occurrence in the course of his work calling for extra exertion or strain other than that required by his usual and ordinary labor.

Commenting upon this case, our Supreme Court, in the course of its opinion in the Watkins case, said: "True, the sudden death of an employee while doing work, which calls for no unusual physical strain, raises no presumption of an accident." In the Gausman case, the claimant, seventy-four years of age and afflicted with chronic nephritis and arteriosclerosis, accompanied by high blood pressure, was working as a carpenter, laying floor, when he lost consciousness and was found wandering outside the building. He went home by street car, ate his dinner, changed his clothes and, while returning from the barber shop that evening, was stricken with apoplexy which resulted in paralysis of his right side. It was a typical July day, warm, without excessive heat, and claimant was working alone indoors at light work and was not subjected to any unusual temperature or extra exertion. His claim for compensation was based upon the contention that he suffered an accident in the nature of a heat exhaustion or prostration which superinduced the apoplectic stroke and permanent disability. In reversing the judgment based upon an award of compensation, our Supreme

Court said: "Before one ailment can be attributed to another, the existence of the latter must be shown. Here, claimant's case fails, for the finding of heat exhaustion is not sustained by the proof." After indicating the particulars in which the evidence was insufficient to sustain the finding of the compensation authorities, the opinion continues: "Treating what happened to claimant that Saturday noon as the beginning of the apoplectic disturbance and a part thereof, it was not shown to have been an accident within the meaning of the Workmen's Compensation Law. To constitute an accident there must be some untoward occurrence aside from the usual course of events. Such stroke will be treated as an accident when resulting from a shock, strain or other injury to the physical structure of the body (*Samoskie v. Phila. & Reading C. & I. Co.*, 280 Pa. 203; *Watkins v. Pittsburgh Coal Co.*, 278 Pa. 463; *Yodis v. Phila. & Reading C. & I. Co.*, 269 Pa. 586), but here nothing of that kind occurred. The work was light with no unusual occurrence. Disability, overtaking an employee at his work, is not compensable unless the result of accident. And the burden is on claimant to prove it was such and not from natural causes: Skinner's Pennsylvania Workmen's Compensation Law 54, and cases there cited. True, Dr. Frederick attributed the exhaustion, or stroke, to claimant's exertion in the performance of his work and expressed the opinion that but for the work it would not have happened at that time; in other words, that the disability was hastened by the work; even so, that alone would not constitute an accident; otherwise it would be unsafe to give employment to anyone advanced in years. Disability, hastened by such exercise, cannot be treated as accidental; neither can death or disability overtaking an employee in the course of his employment and resulting from a natural cause; if it could, it would render

the employer an insurer of the life and health of the employee."

We have consistently followed the Gausman case in many instances too numerous to mention. *Walsh v. Lockhart I. & S. Co.*, 118 Pa. Superior Ct. 467, 180 A. 123, is a recent case in which we affirmed a disallowance of compensation where the evidence was insufficient to sustain the award made by the board. The facts in that case are comparable with those appearing from this record. The employee, when about to empty a can of water into a box containing mortar, suddenly collapsed and fell, struck his head upon the edge of the box and inflicted a laceration on his forehead. There, as here, no autopsy was held and the exact cause of death was not determined. We there held that the testimony was insufficient to support a finding that the death was accidental within the contemplation of the statute.

Our conclusion is that the only inference deducible from the competent evidence in this case is that death from a natural cause overtook the decedent in the course of his employment. Under all the authorities such a death is not compensable.

The judgment is reversed and is here entered in favor of the appellants.