Hecker *v.* Shannopin Coal Company, Appellant.

Argued October 12, 1939.

Before Keller, P. J., Cunningham, Stadtfeld, Parker, and Rhodes, JJ.

*William A. Challener, Jr.,* with him *Frank McC. Painter* and *William A. Challener,* for appellant.

*R. Rhody Brenlove,* for appellee.

Opinion by Cunningham, J., December 13, 1939:

In its main features, this workmen's compensation case so closely resembles that of *Harring v. Glen Alden Coal Co.,* 332 Pa. 410, 3 A. 2d 381, reversing the judgment of this court as reported in 130 Pa. Superior Ct. 552, 198 A. 508, that we are unable to distinguish it upon any substantial ground. If there is a distinction, our error can be corrected through the allowance of an allocatur. By the substitution of one word and one phrase the issue now before us may be thus stated in the language of Mr. Justice Schaffer in the Harring case:

"This case is poised upon a very sharply defined point. Does any evidence show that the deceased, for whose death compensation is claimed, received a blow on his [head]? If it does, the conclusion may be drawn that his death resulted from, or was accelerated by, an injury due to an accident in the course of his employment, and compensation should be allowed. If there is no competent proof of such a blow, then it is established that he died from natural causes, [definite hardening of the arteries], with which he had been afflicted for sometime preceding the day when the occurrence took place, out of which the claim for compensation arises, and compensation is not awardable."

Certain uncontroverted facts appear from this record: During the course of his employment in one of the mines of the appellant company claimant's husband, John Hecker, fifty-eight years of age, suffered, on July 27, 1936, certain injuries to the physical structure of his body when, in the language of the compensation agree-

ment executed by the parties, he "stepped on switch rail, slipped and fell backwards resulting in contusion of back and pelvis." Under the agreement he was paid at the rate of $15 per week, for total disability, from August 4 to October 29, 1936, on which date he died at his home following a cerebral hemorrhage which occurred on October 24.

On behalf of herself and three of their children, his widow, the claimant below and appellee herein, filed a petition for compensation for his death upon the theory, as stated in her brief, "that the deceased sustained an injury to his head on July 27, 1936, in addition to other injuries set out in the compensation agreement and that this alleged head injury caused a slow hemorrhage with a resulting hematoma (cystic formation of blood) ; that subsequently, the hematoma ruptured with sufficient brain damage to cause a cerebral hemorrhage and resulting death."

The contention of counsel for appellant was that the deceased did not sustain any injury to his head when he fell in the mine; that his death was attributable to the natural progress of the arteriosclerosis with which he was afflicted; and that the fall in the mine was caused by his underlying systemic condition which brought about a vascular crisis in the nature of a spasm of the cerebral blood vessel or seepage of serum therefrom.

The referee awarded compensation to the widow and children, the board affirmed the action of the referee and the court below entered judgment on the award; this appeal is from that judgment.

Under the issue as presented to the compensation authorities, claimant, as a practical matter, had the burden of proving by competent evidence not merely that her husband slipped and fell in the mine but also that, in addition to the injuries set forth in the compensation agreement, he then suffered a head injury which resulted in his death three months later.

Whether she met that burden can be determined only

by an examination of the evidence adduced by her, in the light of the principles definitely announced by our Supreme Court in *Adamchick v. Wyoming Valley Collieries Co.*, 332 Pa. 401, 410, 3 A. 2d 377, reversing the judgment of this court, as reported at 131 Pa. Superior Ct. 72, 198 A. 451. In addition to pointing out that "to secure compensation there must be proof both of an accident and of an injury" and that "an accident cannot be inferred merely from an injury," it is further stated in the opinion: "Nor can an injury be inferred simply because there was an accident. There must be proof that the injury resulted from an accident."

By the testimony of her lay witnesses claimant showed that her husband after falling in the mine walked about one hundred and fifty feet to a car in the mantrip, got into it, was taken out of the mine and placed in charge of Dr. D. I. Kirk, the company doctor. Referring to the condition of the employee when first brought to his office, Dr. Kirk testified the patient had "definite hardening of the arteries" with a "high normal" blood pressure; that "he was in intense pain in the lower back, but there were no bruises or signs of trauma at that situation ...... but he was in severe muscle spasm of the lower back, and ...... his mental condition was clear." When asked "the nature and extent of [Hecker's] injuries," Dr. Kirk said, "It was a fall with severe muscle spasm of the lower back," but the x-rays disclosed no fracture or bone injury.

With relation to the physical condition of the deceased between the date of the fall in the mine and his death, excerpts from Dr. Kirk's testimony read: "Q. And how long did you treat him? A. From that time (July 27) until the date of his death, October 29, 1936. Q. How many times did you see him in that interim? A. Oh, let's see; thirty-five times total. ...... Q. Were they house calls or office calls? A. The majority of those were office calls. He came to the office for treatment. Q. When did you treat him at the house? A.

After he fell in the mine on the twenty-seventh of July. From that time until he was able to be about, and he came to the office for observation and treatment. Q. You say until he was able to be about. When was that? A. Well, he was confined to his house approximately two weeks after he fell. Q. And then after those first two weeks he came to your office? A. Yes. Q. And then just before he died did you treat him at home at any time? A. Yes. He fell—as I got the history, he fell in the kitchen one night and he was taken to bed and it was found that he had a paralysis, which I diagnosed as cerebral hemorrhage. Q. And you made a death certificate out to that effect? A. Yes, sir. ...... Cerebral hemorrhage with hemiplegia, left, on October 24, 1936; blood pressure 145/80. Three days later he was unable to take food or fluids and became irrational. Loss of consciousness, October 28. Death at 5:50 P. M., October 29. Q. What do you mean by hemiplegia? A. Paralysis on the left side. ...... -

"Q. Did you have occasion to observe whether he had full use of his arms and legs after the fall in the mine? A. Yes, he was able to use both arms and legs, and he was on his feet once before he was put on the stretcher and taken home, and he walked, with help, from the pit mouth to the mine office. ...... His chief complaint was his back condition, the soreness of his back, unable to straighten up, unable to reach down and pick up things, and that was the main complaint for which I treated him in that entire interval from the time he fell in the mine until he fell in the kitchen with the cerebral hemorrhage. Q. Did you observe his gait after he fell in the mine? A. It was slow and careful but not otherwise abnormal. Q. Did you—after he fell in the mine and you started treating him, did he improve under your treatment? A. He improved to the extent that he was able to get up and walk and was able to come to the office for treatment without difficulty. Q. What did you notice about his posture, both when standing and

when walking? A. Slightly stooped. Q. In what direction? A. Forward. ...... Q. Now, before this time that he fell in the kitchen and since the time that he fell in the mine did you notice anything peculiar about his left hand? A. There was a little tremor in his left hand. Q. Anything else? A. He wasn't able to button his clothes very well with his left hand. Q. Anything else? A. No, that's all. Q. How about his left leg? A. Apparently the left leg was all right. He was able to walk with it. He walked carefully and slowly. ...... Q. Did he complain of headaches to you? A. Never complained of any headache to me." No autopsy was had.

As in the Harring case, the only evidence upon this record relative to any head injury is the following testimony by the claimant: "Q. When your husband was brought home that day what did you do then? A. Why, we helped him take his clothes off and put him in bed. ......Q. Did you look at his head? A. Yes, I looked in his head all over. Q. Did you notice anything on his head? A. Yes, I see on the right side a bump under his bald head. Q. You saw a bump? A. Yes. Q. What kind of a bump was it? A. Well, it was almost like a silver dollar; it was so flat. Q. Did you notice any color on it? A. No."

This testimony is flatly contradicted by her witness, Dr. Kirk, who testified:

"Q. Did you examine his head when he was brought out of the mine? A. Yes, I examined his head and his body—his entire body. ......

"Q. You have testified that you examined this man's head. What was the result of your examination? A. There were no lacerations or bruises or signs of trauma. Q. Did he complain to you of injuries to his head? A. No."

We, therefore, have in this case a situation which seems to us to be practically on all fours with the one presented by the testimony in the Harring case. There,

a vital question was whether there was any competent evidence showing the deceased received a blow on his abdomen. The claimant in that case, the widow of the deceased, undertook to show her husband had a mark on his abdomen when brought home after he had fallen in an empty hopper railroad car while preparing to clean it. Her testimony in that case read: "Q. Now Mrs. Harring do you recall Doctor Doyle being to your home before your husband died? ...... A. Yes. Q. Do you recall calling his attention to any mark or abrasion? A. Yes sir, I did Tuesday morning. I said Doctor, look here. Yesterday it was just a small mark, the tip of the finger, and Tuesday the next day it was like the top of the milk bottle shaped, and he said it was, Mr. Harring told him, the buckle of the belt, and I told him Mr. Harring never wore a belt, he always wore suspenders. Q. Where was this mark? A. Right here on his stomach."

The attending physician in that case, Dr. Doyle, contradicted the testimony of Mrs. Harring relative to the presence of the alleged mark and stated he had no recollection of the conversation testified to by her. Here, as in the Harring case, there was no description, other than as quoted above, of the alleged mark by anyone and "no proof whatever as to what it was or the cause of it or that it came from violence." It is also true in this case that neither the referee nor the board found as a fact that the deceased had any mark of any kind upon his head or had suffered any head injury when he slipped and fell in the mine; nor did the compensation agreement contain any mention of an injury to the head.

Dr. Kirk was not asked whether there was, in his opinion, any causal connection between the fall in the mine and the fatal cerebral hemorrhage. Claimant undertook to show such a connection by the testimony of Drs. John N. Frederick and J. C. MacLean, neither of whom had ever seen the deceased. Each of these doctors was asked to assume, and did assume in their answers to hypothetical questions, that the deceased had

suffered a head injury in the mine. In the question submitted to Dr. Frederick one of the factors stated therein was that the deceased "stepped on a switch rail in the Shannopin coal mine, slipped, and fell backwards, resulting in a contused back and pelvis; *also hurt the right side of his head,* etc." (Italics supplied). It is perfectly clear from his reply that he assumed a cerebral injury at the time of the fall. The material portion of his answer to the hypothetical question reads: *"There was some cerebral injury at the time of the accident;* in all probability, a slow hemorrhage which became cystic and later ruptured at the time that the—Doctor Kirk claims that the man had a cerebral hemorrhage. That is, [at the time of] his accident in July, there was a hematoma developed under the skull, which became cystic, causing increasing pressure on the right cerebral hemisphere, involving the motor areas, so that the left arm became weaker and, as reported, finally totally paralyzed, and that this broke down on October 27, at the time the man became unconscious, and was the factor in producing his death." (Italics supplied).

Dr. MacLean stated his opinion in this language: "It is my opinion that the *head injury* caused a slow hemorrhage with a resulting hematoma. This hematoma caused the slow oncoming paralysis. The hematoma is a cystic formation of blood. At the time of the second hemorrhage—the more severe hemorrhage that caused death— that was due to rupture of this hematoma, with sufficient brain damage to cause a stroke and resulting death." (Italics supplied).

We think there is a close parallel between the testimony of these physicians and that of Dr. Colley in the Harring case. It was there held that such testimony "based upon the assumption" that Harring had received a blow upon his abdomen, would not be sufficient to warrant an award of compensation. There is also on this record expert opinion evidence indicating that the employee's death was the result of the natural progress of

the hardening of his arteries. Dr. Andrew P. D'Zmura, called by appellant, expressed the opinion that if the deceased "had sustained a stroke due to trauma as a result of an accident, he would not have been able to walk one hundred fifty feet to a mantrip car within a few minutes." An excerpt from his testimony reads: "Q. What conclusions have you drawn or what sequence of events have you concluded took place from the facts as presented? A. From the available facts it is my opinion that the fall in the mine was a result and not the beginning of the underlying physical condition which caused his death. He probably had a vascular crisis, whether in the nature of a spasm of the cerebral blood vessel, seepage of serum or the liquid part of the blood from the blood vessel, or, as testified by Doctor Frederick, an actual hemorrhage from the blood vessel. He fell as a result of this state of affairs. He injured his back, which was treated by Doctor Kirk, who noticed the disability of the left hand sometime after the accident. From the testimony of Mrs. Hecker and Josephine Hecker, he apparently continued to have symptoms which could be attributed to a disorder of the blood vessels of the brain until the fatal hemorrhage took place, causing a left hemiplegia, which is one of the most common endings in patients of this type."

It seems to us that the evidence upon which claimant relies to establish the head injury in this case is so similar in quantity and quality with the evidence in the Harring case that it is equally incompetent to sustain an inference that the deceased received any head injury. As there is evidence that in the absence of competent proofs of a head injury, claimant's husband died from natural causes, we feel we should follow the Harring case and reverse the judgment. See also *Burrell v. State Workmen's Insurance Fund et al.*, 127 Pa. Superior Ct. 510, 193 A. 439.

The writer of the opinion in the court below seems to have overlooked some of the evidence in the Harring

case. In support of his conclusion that the case now at bar is not controlled by that case he says: "In the Harring case there was no mark on the decedent's abdomen, whereas in our case the widow testified that there was a lump on his head."

As above shown, there was just as much evidence in that case of a mark on Harring's abdomen, as there is here of a lump on Hecker's head.

Judgment reversed and here entered for appellant.