Gerst et ux. *v.* Smith-Faris Co. et al., Appellants.

31

Argued April 27, 1932.

Before Trexler, P. J., Keller, Gawthrop, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*John H. Sorg,* for appellants. Cited: Gausman v. Pearson Co., 284 Pa. 348; Mauchline v. State Insurance Fund, 279 Pa. 524; Ernest v. Hoffmaster, 10 W.C.B. 419.

*E. P. Curran,* and with him *Samuel Milliken,* for appellee. Cited: Pataky v. Allen Motor Co. et al., 100

Pa. Superior Ct. 343; DiMarcantonio v. State Fund, 15 D. & C. 56; Ford v. Dick, 288 Pa. 140.

OPINION BY STADTFELD, J., October 10, 1932:

This is a workmen's compensation case. The referee and the board allowed compensation. The lower court, SNEE, J., dismissed the appeal of the defendant, and affirmed the award. From that order this appeal is taken by defendant.

The referee made, inter alia, the following findings of facts:

"Second. Albert H. Gerst was employed by the defendant, Smith-Faris Company, as an asbestos coverer at an average weekly wage in excess of $24, and on the 26th, 27th and 28th of December, 1929 he was employed above boiler furnaces; however, due to certain elements emanating through interstices in the furnaces he was only able to work for fifteen minutes at a time, when he would have to quit and come down and get fresh air and water, and after he cooled off he would then return to work for another ten or fifteen minutes.

"Third. Four other men were working above the furnaces with the decedent and they continually complained to one another about the elements emanating from the furnaces, and at noon time on December 28th one of these men was so sick that he did not eat any lunch. The four men and the decedent quit work at about 2:00 P. M., December 28, 1929, all complaining of being distressed, fatigued and sick, and that they had headache, and the decedent started towards his rooming house about seven blocks from the plant and left the other employes at the post office, and appeared to be in a wobbly condition and just about able to navigate.

"Fourth. Two of the furnaces over which the decedent was working had just been put in operation and the fuel used was a mixture of coal and air and if this coal and air was properly mixed there would be as

near as possible complete combustion, and if not properly mixed there would be incomplete combustion, causing a carbon monoxide gas to form, and this gas could have found its way to the place where decedent was working above the furnaces.

"Fifth. Decedent arrived at his rooming house sometime between 2:00 and 3:00 P. M., his landlady seeing and conversing with him at that time, and she did not notice anything unusual about him; however, at about 6:00 P. M., she heard noises coming from decedent's room and sent her husband to investigate, and the husband found the decedent trying to vomit and the decedent appeared to be intoxicated and still had this appearance at 9:00 P. M., and at 10:00 A. M. the next morning the decedent's body was found on the floor of his room and he was dead, having died some time between the hours of 9:00 P. M. and 10:00 A. M.

"Sixth. The 28th and 29th of December, 1929 were cold December days, and the decedent occupied a room adjoining his room mate, a radiant fire gas stove heating both rooms. The house was old, there being five windows in the two rooms; these windows had plenty of openings for air to come in; there seemed to be a lot of draft. The radiant stove was turned out by the landlord at nine o'clock on the evening of December 28th and when the landlord entered the room the next morning at about 10:00 A. M., he found the stove burning but no blaze coming out; the stove was about three parts hot and burning about right for the condition of the weather outside; the transom over a door leading into the hall was open a little bit and there was no smell of fumes coming from the stove.

"Seventh. The deputy coroner viewed the body of the decedent where it lay in the room at about noon December 29, 1929 and performed an autopsy on the body before four P. M. that afternoon and found evidence that the primary cause of death was carbon monoxide poisoning and that there was considerable

pathology in other organs of the body but no evidence of alcohol found in the body, and no one has testified that they saw the claimant (decedent) drink alcohol.

\* \* \* \* \* \* \*

"Ninth. After a careful summary of all the evidence in this case we are of the opinion and find as a fact that Albert H. Gerst, the decedent, while furthering the business and affairs of the defendant on December 26th, 27th and 28th, 1929, took into his vascular system (blood stream) sufficient carbon monoxide gas to cause sufficient pathology in the organs of his body and his brain that he died on December 29, 1929 and that the primary cause of death was the inhalation of carbon monoxide gas while working above the boiler furnaces for a period of 2½ days, which is not an occupational disease, but an injury by accident, which occurred at a particular time, and while the decedent was in the course of his employment with the defendant."

The compensation board, in affirming the findings of the referee, made the additional finding that heat exhaustion suffered by the decedent while in the performance of his duties materially contributed as a cause of his death.

In support of defendant company's appeal it assigns as errors the dismissal of its exceptions to the findings of fact and conclusions of law that the deceased met with an accident in the course of his employment; that his death was the direct result of his having inhaled carbon monoxide gas emanating from the furnaces of the Pittsburgh Steel Company during the course of his employment at the latter's plant; that the deceased suffered from heat exhaustion during the course of his employment, and in entering judgment in favor of claimants.

If the findings are based on any legally competent evidence, or on an inference fairly deducible therefrom, the award must be sustained, though we might

differ from the conclusion thus reached. This therefore requires an examination of the testimony in the case.

Robert Kerr, a coemployee with the deceased on the same work, testified that he with the deceased and Charles A. Swan were working over two of the boilers which were in operation; "there was a lot of gas fumes;" that they had been working two and a half days on this particular job; that Swan and Gerst had complained several times; they remarked that "This was a hell of a job;" that on Saturday, December 28, 1929, Swan and Gerst made several complaints to him of gas fumes emitting from these boilers, as also of the heat; that he went to lunch on that day with Gerst and the latter complained about being sick and all he took was a bowl of soup; that Charles Swan was too sick to go to lunch and laid on top of the boiler room floor; that when they started on this job, both Gerst and Swan seemed to be in perfect health; while working on this job, they could not work steady or stay at it more than ten or fifteen minutes at a time when they would have to get down and get water and get cooled off; that they worked until two o'clock on Saturday afternoon when they left the plant, and he accompanied them as far as the post office, where he left them; that he, Kerr, while working with the deceased, and standing on top of the boiler, covering the pipe, could see the fire through the bricks which were cracked; that ever since Christmas, Gerst and Swan were complaining of the heat; that all of the firemen working on the job complained of both the gas and the heat; that when Gerst left on Saturday to go to his lodging, he seemed "wobbly." That Swan just after quitting work said he had a "hell" of a headache.

The depositions of Edwin Leavitt, another co-employee engaged on the same job, corroborated the testimony of Robert Kerr.

Mrs. Sarah Ford, landlady at the house where de-

ceased had lived, testified that Swan and Gerst occupied two rooms, with five windows in the two rooms and but one door leading out into the hall; that the building was very old and that there were plenty of openings for air to come in; there seemed to be a lot of draft. She said Gerst came in on Saturday afternoon, December 28, 1929; that she apologized to him for not having the gas lit in his room; that he then lit the gas himself; that Swan came in about ten minutes later. About three hours later, at six o'clock in the evening she and her husband heard some noise from decedents' room and she told her husband to go down and see what it was; that she had a gas stove, a radiant heater, in one of the rooms; that it had no flue.

Leonard Ford, the landlord, husband of Sarah Ford, testified that he first saw Swan and Gerst about six o'clock on December 28, 1929 when he heard the noise to which his wife testified and went to the rooms; he found Swan lying on the floor in his underwear and using his clothes for a pillow, and he appeared to be asleep. Gerst was also in his underwear, and sitting up and appeared to be in a great deal of distress and acted as though he wanted to vomit; that he fetched him some water which he drank. The witness asked him "what is the matter with you," and he said "we had a drink." When witness entered the room, it appeared to be warm, and the stove was lit; that he stayed there from six until seven o'clock, and never noticed any gas; that there was enough opening under the door for draft; that he put out the gas when he left; that he next saw them between nine and ten o'clock the same night. Swan was sitting up against his bed on the floor, and Gerst was sitting facing him in his room on his bed. Both of them sitting up and talking. The room seemed to be well ventilated at the time; the stove was lit; the witness extinguished the fire in the radiant stove again, believing that Gerst and Swan were drunk and although it was a very cold night, he

warned them that if they lit the stove again he would call the patrol wagon and have them locked up because Swan was lying on his clothes near the stove and witness was scared of fire.

At about ten A. M. the next morning, the witness found Gerst and Swan dead in their rooms. He discovered Swan's body in bed with bed covering over the body and Gerst's body in the other room on the floor; the electric light was on, and the radiant stove burning in the room with Swan's body, and the rooms were warm, but witness did not smell anything; there were no fumes and the room was comfortable; that if it had been hot it would not be comfortable; he stayed there more than ten minutes; he examined the bodies of both men and they were cold; he notified the police authorities and the coroner. The police came about ten minutes later, and he went into the rooms with them, and found the rooms to be about in the same condition; the transom above the door was open a little bit, the gas was still burning; the gas stove has been in continuous use since, and no alterations or modifications made in it and the room has been rented to roomers since the death of decedents, and the same stove used by them and there has been no difficulty about it; that when witness came into the room about ten A. M., there wasn't any blaze coming out but the stove was about three parts hot; that it was burning about right for the condition of the weather.

Dr. A. R. Wilson, who officiated as deputy coroner, was called as a witness by claimant, and testified that he made an autopsy on the body of each decedent, and in his opinion, death in the case of both men was caused by carbon monoxide poisoning. A post mortem examination was made on December 29, 1929. The stomach was explored and no evidence found of alcohol therein; the brain was not examined. The right auricle was distended with venous blood; the stomach, intestines and mesentery congested, and the right auricle almost

black and distended with venous blood and bloody serum in the pleural cavity. He further testified that carbon monoxide poisoning primarily affects the blood stream, and secondary conditions affecting the brain and other organs of the body due to this primary saturation of the blood stream could cause death six to ten hours later as a result of the effect upon the brain surface and other organs of the body. Assuming that there was no incomplete combustion in the room, and finding death caused by carbon monoxide poisoning, he was of the opinion that he got it through inhaling coal gas at the plant. But considering the circumstances that decedent was able to leave the plant after being poisoned by the carbon monoxide and able to do what he did after leaving the plant, his death would not be caused by carbon monoxide that he might have inhaled at the plant.

Dr. E. J. Schachter, a physician called by claimant, testified that the findings or symptoms testified to evidenced carbon monoxide poisoning; that assuming the testimony of Mr. and Mrs. Ford to be true as to the condition of the room and that none of the times at which they, or either of them, were in the room, there were any fumes noticeable to them, in his opinion, the carbon monoxide poisoning was received at the plant; that carbon monoxide poisoning is a question of degree; that in numerous cases, where persons are found dead in a closed room where a gas stove has been burning, death is not stated as due to "carbon monoxide poisoning," but "due to asphyxia." In the latter, there are very little petechial hemorrhages; that the pathology in this case could not have been set up in a few hours, but was a gradual development over the two and a half days the decedent worked over the boiler furnaces.

Dr. C. W. W. Elkin, a physician on the staff of the Allegheny General Hospital, testified that under the conditions under which it was claimed decedent's were

working at the plant and assuming that the conditions in the room where they were found dead were satisfactory, the death came from previous exposure, assuming that they had carbon monoxide at the plant.

On behalf of defendant, Dr. H. W. Day testified that he was present and assisted when Dr. Wilson made an autopsy on the bodies of decedents, and in his opinion, death was due to carbon monoxide poisoning.

Two police officers who were called in when the bodies were discovered, testified that on entering the rooms, the rooms were too hot for human beings to stand it; the flames from the radiant stove were shooting up from four to six inches above the stove, and the stove was red hot, so hot that they found two candles melted in the adjoining room. They looked carefully for any signs of ventilation, and found none, the transom being closed and the clothing of the decedents scorching hot and the fumes and odors in the rooms awful. Their testimony differs materially from that of the landlord and landlady.

Harry Forbes, an employee of defendant as superintendent of construction on the same job, testified that at some times he would work right beside decedents and did not notice any fumes or gas around these furnaces, and that none of the men ever complained to him of gas; that the only thing Gerst and Swan complained of was the terrific heat.

J. E. Owens, employed by the Pittsburgh Steel Company as steam engineer, testified that decedent's employment required that he work above boiler furnaces that were fired by pulverized coal mixed with air, which forms an explosive mixture, and if the coal is ground fine enough, there is instantaneous combustion; however, the quantity of air mixed with the quantity of coal must be equal, and if you have the required amount of coal and air, you have as nearly as possible practically complete combustion. Incomplete combus-

tion of this mixture would cause carbon monoxide; however, this would be indicated by settings melting down showing that too much coal was being used for the amount of air furnished. The boiler furnaces were new, just having been completed at about the time decedents took up their work on top of these furnaces, and two of these furnaces had just been put in operation and these two were the ones decedent was working on. A fan driven by a turbine furnished the air, and the coal was brought up by conveyors. That the machinery was in perfect running order during the time decedent worked above the boiler furnaces.

Prof. Saylor, an assistant professor of mechanical engineering and connected with the Carnegie Institute of Technology, Pittsburgh, testified to an examination of conditions at the defendant company plant on March 4, 1931. That he went to the top of the boilers where the record showed the men, Swan and Gerst, were working; that he took a sample of air above the boiler and at the steam pipe in front of and above the boiler and had an analysis made under his supervision at the Pittsburgh Testing Laboratory; this showed a .01% carbon monoxide; that the U. S. Bureau of Mines has set up a standard of safety of .01% for continuous employment; that as the result of findings of his experience, this is a very safe maximum amount. He did not at the time he made his tests notice any smoke coming up there nor any particular gas coming up from that boiler. He did admit, however, that if the evidence showed that three men who were standing in the same position as he did at the time he made the test, had the symptoms complained of, that there was a different condition. He also made a test on March 4, 1931 of the stove that was in the rooms of the men; the radiants were in good shape and the burners were clean; that he took a sample of the air three inches above the stove with the valve half open, the flame ex-

tending within three inches of the top of the stove. He then turned the stove to its full capacity, that is, opened the gas valve wide open, and took another sample three inches above the stove and in the same place; the transom was slightly open. The test showed a .02% with the valve half open, and a .08% with the valve fully open, of carbon monoxide. Whether it would or would not be cleared away would be relative to the amount of ventilation. He did not make any test of concentration of carbon monoxide in the room furthest from the stove.

Dr. J. W. Means, a practising physician on the staff of the Pittsburgh Hospital, to whom all of the testimony had been submitted, and read and studied by him, testified that decedents were not subjected to carbon monoxide at the plant sufficient to cause or be an aggravating cause of their death. He believed that they died of carbon monoxide poisoning in the rooms; that a person, if subjected to carbon monoxide poisoning over a period of several days, sufficient to eventually cause death, would not have been able to leave his work, wash his hands and face, and change his clothes, walk five or ten blocks to the post office, and then home; if he was able to go out and he was not unconscious at any time, he subsequently wouldn't become unconscious after having been subjected to concentration of carbon monoxide which didn't cause unconsciousness at the time of exposure; that if these men had died as a result of carbon monoxide poisoning that they had inhaled at the plant, they would have had to become unconscious at the plant.

As stated in the opinion of the compensation board, "was the exposure to the heat and carbon monoxide on the premises of the defendant the proximate cause of the death of the decedents, or exposure to the fumes of the radiant gas heater found burning in the room where death occurred? We regard this as the crux

of the case. ...... This heater might be taken as a serious contributing factor if the men had died sometime in the morning. But they were cold when they were found, and it is not reasonable to suppose that a lighted heater would have any immediate effect. Furthermore, the landlord found the men in a state of collapse early in the evening following their return from the premises of defendant company. ...... A fair and reasonable construction of the evidence leads us to the conclusion that decedents met accidental disability sufficient to cause death while in the performance of their duties, and we affirm the findings of fact, conclusions of law, and the award of the referee, with this additional finding of fact, that heat exhaustion, suffered by the decedents while in the performance of their duties, materially contributed as a cause of their demise.''

We have referred at greater length than usual to the testimony in the case on account of the importance of the crucial question on which the determination of the case depends.

Appellant has assigned, inter alia, as error the dismissal by the court of its exception to the finding of fact that decedent suffered from heat exhaustion during the course of his employment ....... which heat exhaustion materially contributed to the cause of his death.

The facts as to the conditions at the plant, so far as the heat is concerned, are not in dispute. J. E. Owens, one of the defendant's witnesses, testified that the decedents were working around pipes containing 700° Fahrenheit. Forbes, superintendent of defendant company, testified that ''the condition was very hot,'' and that ''the only thing everybody was complaining up there was the terrific heat.''

We think that the court did not err under the circumstances in overruling defendant's exception on this point.

Appellant invokes the rule laid down in the case of Mudano v. Phila. Rapid Transit Co., 289 Pa. 51, that no award can be based upon the testimony of claimant's medical experts for the reason that their opinions are contradictory, and the acceptance of the opinion of one necessitates the rejection of the opinion of the other.

All of the physicians agreed that the decedents died of carbon monoxide poisoning. Claimant's medical experts knew nothing about the condition of the plant where the decedents worked. Dr. Wilson, deputy coroner, admitted that no facts were adduced from any one as to what could or might have happened before these men went into their room on the 28th of December, and that he did not go into that.

Dr. Schachter based his opinion that the carbon monoxide was inhaled at the plant on the assumption of the truth of the testimony of Mr. and Mrs. Ford that at no times when they visited the rooms where decedents died were there any fumes noticeable.

The condition of the rooms, as also of the plant where they worked was established by competent and credible lay witnesses, and it is evident that the referee elected to believe the testimony of claimants' witnesses when he decided that the plant was the place where the decedents were exposed to the fatal gas rather than the room. We quote from the referee's opinion: "The coroner (Dr. Wilson) testifies that carbon monoxide primarily affects the blood stream and secondary conditions affecting the brain and other organs of the body due to this primary saturation of the blood stream could cause death six to ten hours later, and this testimony fully coincides with the testimony of the carbon monoxide experts, Drs. Schachter and McMeans, and we believe that this is just what happened in this case and would warrant the following." The referee then proceeded to make his find-

ings of fact and award of compensation to the claimants.

In determining that the decedents inhaled the carbon monoxide in the course of their employment, the referee did not rely on contradictory expert opinions, but did consider the symptoms exhibited by the men while at work as indicative of the place and time when the gas was inhaled.

Death resulting from carbon monoxide poisoning is an accidental death and under our decisions is compensable: Pataky v. Allen Motor Co. et al., 100 Pa. Superior Ct. 343; DiMarcantonio v. State Fund, 15 D. & C. 56.

Death resulting from heat exhaustion constitutes an accidental injury within the meaning of the Workmen's Compensation Law: Clemens v. Cornish, 295 Pa. 73; Matis v. Schaeffer, 270 Pa. 141; Lane v. Horn and Hardart Baking Co., 261 Pa. 329.

As to the findings of fact by the referee and workmen's compensation board, the only question for the court is: Does the record contain legally competent evidence to sustain them? Ford v. Dick, 288 Pa. 140.

If the finding is based on any competent evidence or on an inference fairly deducible therefrom, the award must be sustained, though we might differ from the conclusion thus reached. We cannot substitute our judgment for that of the referee or the board, as the compensation act has delegated to them the exclusive function of determining these facts. An appellate court will not review such conclusion: Morris v. Yough Coal and Supply Co., 266 Pa. 216, 219; Todd et ux. v. Lehigh Valley Coal Co., 297 Pa. 302.

When conclusions of a referee in a workmen's compensation case are approved by the board and are supported by competent evidence, they are conclusive as the verdict of a jury, and this is also true as to proper inferences to be drawn therefrom: Sgattone v. Mulholland and Gotwals, Inc. et al., 290 Pa. 341.

We believe that the evidence in this case warrants the finding of the referee, approved by the board, and judgment was properly entered in favor of claimant.

The assignments of error are overruled and the judgment affirmed.