Opinion by
 

 Rhodes, J.,
 

 Claimant filed a petition for compensation on behalf of herself and two minor children under sixteen years
 
 *268
 
 of age. She averred that her husband, Rodger Johnson, died as the result of an accident in the course of his employment with defendant on July 20, 1934. From an award in her favor defendant’s insurance carrier appealed unsuccessfully to the Workmen’s Compensation Board and the court below.
 

 On its appeal to this court, we are urged to reverse the judgment entered on the award for the following reasons: (1) That there was not sufficient competent evidence to sustain the finding that deceased suffered an accidental death as the result of the inhalation of ammonia fumes; (2) that expert testimony was necessary to establish a causal connection between the alleged inhalation of the ammonia fumes and deceased’s death, and that such testimony was lacking.
 

 Unless it can be said that there was no competent evidence to support the findings and conclusions of the referee and board, they cannot be disturbed
 
 (Petrovan v. Rockhill Coal & Iron Co.,
 
 130 Pa. Superior Ct. 58, 196 A. 516), and, because the factual issues have been determined in claimant’s favor, the record must be read in the light most favorable to her.
 
 Zbirowski v. John T. Lewis & Bros. Co.,
 
 130 Pa. Superior Ct. 222, 196 A. 606. Applying these principles it appears that deceased, who was 49 years of age, weighed about 198 pounds, and was about 6 feet tall, was employed by defendant employer as foreman of its wax department. On the day of his death he left his home in the morning in apparent good health and spirits, accompanied by his son who was employed at the same place. Several witnesses who saw him during the day testified to the same effect. He engaged in athletics, and there is no history of any serious heart condition or other physical disability. On the contrary, the evidence indicated that he enjoyed good health.
 

 The accident seems to have occurred between 3 and 4 o’clock p.m. The only eyewitness to the events cul
 
 *269
 
 minating in the demise of the deceased was H. E. Anderson, an electric welder, also employed by defendant employer. He testified that on the day in question he was called i;o make some repairs to the ammonia coils, located on the second story of one of employer’s buildings, which were covered by a cone-shaped roof. When he arrived at the coils, deceased was already there, and was engaged in knocking the rust scale from the coils with a hammer, and standing between several sets of coils about three feet from Anderson. The two men were conversing, when deceased slumped down suddenly and tried to catch himself by the pipes. Anderson reached over and asked him what was wrong. Beceiving no answer he called for help, and deceased was taken to the hospital. He testified further that later he returned to the place where deceased had been working, and found a hole in the pipe, the size of a little finger, from which ammonia fumes were escaping; that he was strangled by the fumes, and had to rush away to recover his breath. He explained that he did not notice the fumes when deceased was present because the leak was above the level of the head, and when deceased sat down the ammonia fumes would not be noticeable at that level. Furthermore, there was a breeze at that point blowing from Anderson toward deceased, and the fumes were not detected until he was within a foot of the hole from which they were escaping. Concerning the effects of inhaling ammonia fumes from the coils, Anderson said: “It gags you. You can’t breathe, or talk, or anything. It shuts off your wind....... You can’t cough, or talk at all, you just have to get into the air until it wears off.” Another employee testified similarly. Witnesses who helped remove deceased from between the coils or accompanied him to the hospital testified that “his condition was blue,” and that “his color was very flushed and his throat was open, and it seemed to be blue (indicating on both sides).”
 

 
 *270
 
 At the hospital Dr. W. F. Pohl examined deceased, and found that his heart had stopped. He testified that “he had more an ashen, or cyanotic color, but there was nothing else particular about him much, except that he had some odor of ammonia about him then,” and that the odor of ammonia must have been on his body or clothes, or both. The undertaker testified that it was very difficult to prepare the body for burial; it was dark, especially the face, and very much congested; “his veins were swollen and his condition was about (indicating large neck).”
 

 Dr. Pohl, who testified for claimant, expressed no opinion as to the cause of death; in fact, careful reading of the testimony discloses that he was not asked for one. The only other physician called by claimant was Dr. M. E. Headland, coroner of Butler County. He examined the body of deceased at the hospital, and testified, over objection of defendant, that “after investigation, and hearing the witness, and seeing the place where death occurred, it was my decision he was asphyxiated from ammonia gas.” He so certified to the Bureau of Vital Statistics, and this certificate, offered in evidence by claimant, over objection of defendant, read: “Accidental death — asphyxiation from inhaling ammonia fumes while working at the Valvoline Oil Company.” Plainly, the opinion of Dr. Headland was based on facts elicited by his investigation and inquiry. He was the first witness called by claimant, and neither stated the facts upon which his opinion was founded, nor had any of the circumstances surrounding the death of deceased been developed, so that it was a manifest impossibility for him to rely on anything then in the record. At that time it was barren, except for his own testimony. Consequently, his testimony, considered as that of a mere expert, was inadmissible. In
 
 Howarth et ux. v. Adams Express Co.,
 
 269 Pa. 280, at page 283, 112 A. 536, at page 538, in an
 
 *271
 
 opinion by Mr. Justice Walling, our Supreme Court said: “An expert may express an opinion on an assumed state of facts, which the evidence tends to establish, but not on what some one told him, nor on what he learned from another doctor, nor from the history of the case, we know not what nor by whom communicated. An opinion based on such a question would naturally be misleading. The answer is also bad, for it does not show what had been given the witness as the history of the case, nor assume the truth of the evidence to which he had listened. See
 
 Becker v. Phila. R. T. Co.,
 
 245 Pa. 462 [91 A. 861];
 
 Yardley v. Cuthbertson,
 
 108 Pa. 395 [1 A. 765];
 
 McDyer v. Eastern Penna. Rys. Co.,
 
 227 Pa. 641 [76 A. 841]. In such case, an; expert opinion cannot be based upon facts not before the jury: Rogers on Expert Testimony (2d ed., p. 82); nor upon hearsay: Lawson on Expert and Opinion Evidence (2d ed., p. 266).” See, also,
 
 Troxell v. Shirk et al.,
 
 130 Pa. Superior Ct. 40, 48, 196 A. 899. In
 
 Knisely v. Knisely,
 
 120 Pa. Superior Ct. 140, at page 148, 182 A. 51, at page 55, cited by claimant appellee, we indicated that the testimony of the doctors, in that case, who based their conclusions partly upon the history of the case, “was competent, since they stated the facts which they assumed to be true and which formed the basis of their conclusion.”
 

 We have held that certified copies of death certificates issued under Section 21 of the Act of June 7, 1915, P. L. 900, 35 PS §§ 451, 471 (the constitutionality of which has never been decided, and which, as to the matter now in hand, has not been modified by the amendments to the statute), are, at best, only prima facie evidence of any facts therein stated, and are open to explanation and contradiction by an opposing party.
 
 Griffin v. Rational Mining Co.,
 
 127 Pa. Superior Ct. 588, 193 A. 447, and cases therein cited. Where, as in the instant case, the physician who made the certificate is a witness for the party offering it, and his testimony
 
 *272
 
 as to the cause of death is inadmissible for the reasons above set forth, the evidential value accorded by the statute is destroyed. It would be anomalous to hold that the physician’s opinion of the cause of death, inadmissible as testimony, was nevertheless to be considered prima facie evidence when offered in the form of the certificate of death.
 

 These conclusions deprive claimant’s case of any competent medical testimony concerning the cause of death, and if she were confined to such method of proof her cause would fail. In
 
 Bunnell v. State Workmen’s Insurance Fund et al.,
 
 124 Pa. Superior Ct. 171, 188 A. 411, we referred to the fact that there are two lines of cases in Pennsylvania dealing with this question. One group holds, in effect, that where the injury or death is immediately and directly, or naturally and probably, the result of the accident, the connection between them does not depend solely on the testimony of professional or expert witnesses; into the other class fall those cases where claimant or plaintiff must rely on professional or expert opinion to connect the accident with the injury or death alleged to have resulted therefrom. The respective cases are collected in footnotes to the Bunnell case, supra, at pp. 174, 175, and it is unnecessary here to do more than refer to them. “In both classes of cases the evidence whether expert or otherwise, must be such as to support a finding that the disability or condition alleged as ground for damages or compensation, was the natural and probable result of the accident:
 
 Sullivan v. B. & O. R. R. Co.,
 
 supra [272 Pa. 429], p. 435;
 
 Whelen v. Eastern Coal Dock Co.,
 
 80 Pa. Superior Ct. 154. In some cases such finding may be made from the circumstances of the death or injury:
 
 Zelazny v. Seneca Coal Mining Co.,
 
 275 Pa. 397 [119 A. 487]. See also:
 
 Yodis v. P. & R. Coal & Iron Co.,
 
 269 Pa. 586 [113 A. 73];
 
 Zukowsky v. P. & R. Coal & Iron Co.,
 
 
 *273
 
 270 Pa. 118 [113 A. 62]”:
 
 Davis v. Davis, Director General,
 
 80 Pa. Superior Ct. 343, at page 347.
 

 We are of the opinion that there was sufficient competent evidence in this case to warrant the finding of the referee and board that deceased died as the result of the inhalation of ammonia fumes, because his death was “so immediately and directly, or naturally and probably, the result of the accident.” Proof of causal connection did not depend solely on the testimony of professional or expert witnesses.
 

 Prior to the fatal occurrence, deceased was to all appearances a healthy, robust man. Except for a trifling interruption, he worked steadily and without difficulty. He performed manual work in connection with his supervisory duties, and engaged in athletics. The testimony of Anderson furnishes sufficient basis for an inference that deceased inhaled fumes of ammonia escaping from the hole in the coils. See
 
 Nesbit v. Vandervort & Curry et al.,
 
 128 Pa. Superior Ct. 58, 193 A. 393. Cf.
 
 Jackson et ux. v. United States Pipe Line Co.,
 
 325 Pa. 436, 439, 191 A. 165. Thereupon he lapsed into unconsciousness from which he never recovered. The absence of outcry or visible signs of difficulty is accounted for by the testimony of fellow employees, previously related, concerning the effect of inhaling such fumes.
 

 Claimant’s evidence did not reveal the intervention of any other agency to which his death could be attributed. Cf.
 
 Morris v. Lehigh Valley Coal Co.,
 
 121 Pa. Superior Ct. 493, 184 A. 266. With the evidence of the suffocating effect of ammonia fumes in the record (not only from claimant’s witnesses, but also from the medical experts who testified for defendant), it was not unreasonable or improper to ascribe the death of deceased to the inhalation thereof, without the aid of expert testimony. Analogously, it has been held that, where destruction of property is alleged to have been
 
 *274
 
 caused by the discharge into the atmosphere of deleterious chemicals from a neighboring industrial plant, cause and effect need not be shown by expert testimony. Such a case was
 
 Kent v. General Chemical Co.,
 
 285 Pa. 34, at page 37, 131 A. 588, at page 589, where the Supreme Court, in an opinion by Mr. Justice, now Chief Justice, Kephabt, said: “Where facts from which causal connection may be found have been testified to with sufficient clearness and definiteness that a layman in the ordinary affairs of life could infer the cause from the effect, expert evidence is not necessary. If the testimony of experts were to be required in every case, many meritorious ones would fail; it would place an undue burden on poor litigants....... Here we have the positive evidence as to the farm being in normal condition, the fumes passing over the land, and the condition of vegetation, trees, and property immediately after; there was sufficient evidence from which the jury, from the common experience of men, could infer the causal relation to exist and that the damages came from defendant’s plant:
 
 Pennsylvania Lead Co.’s App.,
 
 96 Pa. 116, 125;
 
 Sullivan v. Jones & Laughlin Steel Co.,
 
 208 Pa. 540 [57 A. 1065].” See, also,
 
 Procz et al. v. American Steel & Wire Co. of New Jersey,
 
 318 Pa. 395, 178 A. 689;
 
 Burkhardt et ux. v. American Steel & Wire Co.,
 
 74 Pa. Superior Ct. 437. In
 
 Lexington & Eastern Ry. Co. v. White,
 
 182 Ky. 267, 206 S.W. 467, an action to recover damages for injuries to plaintiff alleged to have been caused by negligently running trains through a tunnel in which plaintiff was working, the court remarked that, “although no one had previously been overcome by smoke in the tunnel, it is a matter of common knowledge that a sufficiency of smoke will suffocate one exposed to it.”
 

 Defendant’s case consisted of the testimony of Drs. Ingram and Berg, who performed an autopsy on the body of deceased four days after it had been embalmed.
 
 *275
 
 Dr. Ingrain said that “death was dne to a pulmonary occlusion, primarily; secondarily to a coronary occlusion.” He testified that deceased had a “degeneration of the heart muscle,” and “that meant a weak heart.” The coronary occlusion was “in the right lung extending over into the right chambers of the heart. A mass of hard, black, blood clots....... The nearest thing we could arrive at was this degeneration of the heart on account of interfering with the circulation allowing blood to coagulate in the pulmonary veins, more pronounced in the right side of the heart which propels the blood through the lungs.”
 

 In the opinion of Dr. Berg, death was due to “coronary occlusion and anemia of the brain, which caused paralysis of the fourth ventricle, causing death.”
 

 Both doctors said that deceased was afflicted with hardening of the coronary arteries, and that his death was not occasioned by inhalation of ammonia. On the other hand, they were in substantial accord that inhalation of ammonia fumes impedes the respiratory process. Dr. Ingram said that it “causes spasm immediately almost of the muscle coat or middle coat of the respiratory tube and that produced immediate spasm. Nature tries to shut off that ammonia from getting down in the lung.” Dr. Berg described the effect, as “a spasm of the epiglottis, which is nature’s protective measure to prevent any irritating gas entering the lungs.” Dr. Ingram testified: “Q. Would that spasm that you speak of, would the secondary effect of that be extra requirement of the heart? A. If a man had a weak heart it might. Like any extra work would do but those symptoms would have to be present before I could attribute it to the ammonia gas. If this man gave symptoms of choking and all that, I would have taken that all into consideration but he had no symptoms as far as I know. All I know is he died. ......Q. If there was that spasm in the throat and
 
 *276
 
 upper tubes, it would put an extra pressure on the heart? A. It would if present sufficient. If momentarily for % minute or so a weak solution less than 1 percent 1% percent is usually enough to take a man.” It will be remembered that claimant’s witnesses said that one affected by the fumes could not choke. In addition, the doctors ruled out this possibility because they found no evidence of ammonia in the body.
 

 Opposed to this testimony is that of Anderson, referred to previously, who said that when he returned to repair the hole at the place where deceased had been “...... I got a whiff of ammonia fumes, and it strangled me.”
 

 The admission drawn from Dr. Ingram may explain why deceased could not escape, although Anderson and the others always did. Assuming that the weakened condition of deceased’s heart contributed to the fatal result, claimant is still entitled to compensation.
 
 Lafferty v. Carbo-Oxygen Co. et al.,
 
 122 Pa. Superior Ct. 425, 185 A.
 
 883; Procopio v. Susquehanna Collieries Co.,
 
 122 Pa. Superior Ct. 514, 186 A. 283.
 

 Dr. Ingram’s conclusion seems to be that the lungs were occluded by blood clots due to the inability of the heart to maintain the proper circulation, and Dr. Berg apparently held this view also. In other words, they believed that death was due to deceased’s inability to get air into his lungs, but attributed that inability to the fact that the lungs were filled with blood, rather than to constriction of the respiratory tube. However, the significance of these blood clots was dissipated by Dr. Pohl, who testified: “Q. Doctor, a man who has been embalmed for four days, and then an autopsy is performed, state what your experience is, as to blood clots in .the organs that long after embalming. A. Regardless of the cause of death, there are always blood clots in a body, or practically always, and it would be impossible to embalm a body and get all the blood clots
 
 *277
 
 out. Q. Would these blood clots appear in the heart and lungs and different arteries? A. They might. Q. Is that usual? A. It is usual....... Q. Would an examination, or post mortem that is held four days after death, would it be difficult to detect a condition at the time of death? A. I think it would be very difficult with these clots, because they are common, as I said, and after any embalming, because an undertaker uses a blood solvent to try to get the clots out, but they never get the clots out, and it would make no difference whether an autopsy was done four days, or one day after embalming....... Q. You would have no trouble in determining between blood clots that were there before the man died? A. I think it is very difficult very often. Q. But doctors do make that distinction, don’t they? A. Sometimes. Q. They do it regularly in autopsies, don’t they? A. I think in the majority of cases, it would be hard to tell the difference. It would be impossible to tell in a great many cases. Q. In some cases? A. In a majority of cases, the blood is drained out and coagulates — coagulation of a great part of blood has already taken place, before perhaps, even the undertaker has drained the blood from the system.”
 

 Appellant (insurance carrier) contends that the testimony of the expert witnesses was conclusive upon the compensation authorities because based upon an autopsy, and cites
 
 Burrell v. State Workmen’s Ins. Fund et al.,
 
 127 Pa. Superior Ct. 510, 193 A. 439, and
 
 Walsh v. Lockhart Iron & Steel Co.,
 
 118 Pa. Superior Ct. 467, 180 A. 123. We do not so read those cases. At best, defendant’s experts furnished a basis for a finding opposite to that justified by the evidence of claimant, and the responsibility of determining the question so raised has been placed by the statute on the referee and board. A somewhat similar situation obtained ip.
 
 Johnson v. Orcutt et al.,
 
 103 Pa. Superior
 
 *278
 
 Ct. 507, 157 A. 46, except that in that case there was competent medical testimony offered by claimant. The referee disallowed compensation, and on the same testimony the board made an award, and was upheld by the court below and this court. In the course of that opinion we said, at page 511: “The medical testimony upon the vital issue in the case was irreconcilably conflicting....... The issue was one of fact and the legislature has committed the final decision thereof to the compensation authorities. Upon this appeal, it is not our function to weigh the conflicting testimony of the medical witnesses; the sole power conferred and duty imposed upon us is ta ascertain whether there was evidence legally competent to sustain the findings of the board, and whether the law has been properly applied to those findings:
 
 Puza v. P. & R. C. & I. Co.,
 
 98 Pa. Superior Ct. 139....... True, other physicians who examined decedent in the hospital and made a post mortem examination expressed opinions in sharp disagreement with those we have quoted and were supported by the testimony of an expert called by the carrier, but it is not for us to say which set of opinions should have been adopted by the board.” See
 
 Sepesi v. Pittsburgh Coal Co.,
 
 114 Pa. Superior Ct. 385, 174 A. 590. In a workmen’s compensation case, findings of the referee approved by the board and supported by competent evidence are as conclusive as the verdict of a jury, and this applies to the proper inferences to be drawn therefrom.
 
 Gerst et ux. v. Smith-Faris Co. et al.,
 
 107 Pa. Superior Ct. 30, 44, 162 A. 490. In
 
 Kent v. General Chemical Co.,
 
 supra, 285 Pa. 34, at page 38, 131 A. 588, at page 590, the Supreme Court said: “Appellee’s case was opposed by evidence from experts of high standing....... The jury could make its own deduction when considering the evidence of the experts with the facts testified to by plaintiff’s witnesses.
 
 Bliss
 
 
 *279
 

 v. Anaconda Copper Mining Co.,
 
 167 Fed. 342, 359; affirmed, 186 Fed. 789.
 

 “But, notwithstanding these observations, judgment n.o.v. could not be entered on the strength of defendant’s oral testimony. There was sufficient evidence in appellee’s case to go to the jury. The strength of appellant’s oral evidence was for them. We said in
 
 Shaughnessy v. Director General of Railroads,
 
 274 Pa. 413 [118 A. 390], no matter how strong the oral evidence appeared exculpating the alleged wrongdoer from liability, since its weight depended upon the credibility of the witnesses it must be submitted to the jury. In this case the jury could, on comparison with the positive evidence in the case, have disregarded it or held it insufficient, but if there was any miscarriage it should be corrected by the trial court, who, if convinced of its certainty, should not hesitate to grant as many retrials as might be necessary to secure justice. We cannot say its discretion in this regard was abused.”
 

 In a compensation case the appellate court’s power of review is even more restricted. And, although we may feel that the weight of the evidence as a whole is against a finding of fact of the compensation authorities, such finding may not be disturbed if it is supported by legally competent evidence.
 
 Paulin v. Williams & Company, Inc., et al.,
 
 122 Pa. Superior Ct. 462, 186 A. 415, affirmed, 327 Pa. 579, 195 A. 40.
 

 It is the prerogative of the compensation authorities to give the testimony of witnesses such consideration as it may deserve, and to accept or reject it in whole or in part accordingly.
 
 Zbirowski v. John T. Lewis & Bros. Co.,
 
 supra.
 

 Finally, relying upon
 
 Gausman v. R. T. Pearson Co.,
 
 284 Pa. 348, 131 A. 247, and
 
 Morris v. Lehigh Valley Coal Co.,
 
 supra, appellant argues that the finding of the referee was a mere guess between two possible causes of death. In the cases to which reference is
 
 *280
 
 made claimant’s evidence showed two possible causes of death, and the doctors who testified for claimant could not individuate either one. In the case at bar, claimant’s evidence points consistently to a cause for which defendant would be liable, and it is only in defendant’s evidence that another cause, absolving defendant, is found. That is a characteristic of any litigated controversy. It is precisely that dichotomy which necessitates a fact-finding body empowered to resolve it. In cases arising out of the Workmen’s Compensation Act the referee and board are entrusted exclusively with that function. When the case contains competent evidence, sufficient to support a finding either way, the decision between the two does not constitute a guess; it is only when the finding has no competent evidential support that it can be so characterized.
 

 The second assignment of error is sustained, although, for the reasons above set forth, it does not affect the result we have reached. The other assignments of error are overruled, and the judgment is affirmed.