## PETERS v. MUTUAL LIFE INS. CO. OF NEW YORK.

### No. 3697.

District Court, M. D. Pennsylvania.

Jan. 14, 1939.

Supplementary Order Jan. 25, 1939.

Welles, Mumford & Stark, of Scranton, Pa., for plaintiff.

O'Malley, Hill, Harris & Harris, of Scranton, Pa., for defendant.

WATSON, District Judge.

This is an action to recover disability benefits which the Plaintiff claims to be due him under the terms of a life insurance policy issued to him by the Defendant October 18, 1928. Trial was had before a jury, and the jury returned a verdict in favor of the Plaintiff. Defendant moved to have the verdict set aside and for judgment in accordance with its motion for a directed verdict and, in the alternative, for a new trial.

The basic issue raised by Defendant's motion is, whether there is sufficient competent evidence on the record to support the jury's finding that the Plaintiff became totally and permanently disabled in October, 1931, before the policy of insurance lapsed for non payment of premiums, which lapse occurred November 18, 1931.

Plaintiff's evidence as to the existence of total and permanent disability before the policy lapsed consisted of his own testimony and the testimony of medical experts.

Plaintiff testified that in May, 1931, he suffered from pains around the upper regions of the heart; that, sometimes, these pains were sharp and sometimes numb; that they would shoot up his left shoulder and down his left arm to his finger tips; that at times they were so severe they made his arm stiff; that the pains occurred with exertion and without exertion and at intervals shot up his neck into his head; that his heart thumped; that he was weak and nervous, short of breath and perspired daily; and that he suffered from dizzy spells, headaches and nausea. He also testified that he was examined by a Dr. Stearns, of Delaware Water Gap, on May 23, 1931. Dr. Stearns died prior to the trial and the result of his examination is not in the record. Plaintiff further testified that he underwent an operation for appendicitis on September 13, 1931; that, after the operation, the nausea and headaches left and the sweating and dizzy spells

lessened to some degree, but the pains and thumping of the heart remained and were present up to the time of trial.

Dr. Shull, one of Plaintiff's medical experts, testified that he examined Plaintiff in October, 1935, and found that he was suffering from cardiac circulatory asphenia, or weakness of the muscles of the heart, and that, at the time of the examination, the ailment was sufficiently serious to affect Plaintiff's ability to perform manual labor. Dr. Shull did not examine Plaintiff's heart prior to October, 1935, and did not give any opinion as to Plaintiff's condition prior to that time.

Dr. Davis, another of the Plaintiff's medical experts, testified that he had examined Plaintiff only once, January 31, 1938, at which time he found Plaintiff suffering from some structural damage to the heart and a nervous condition, spoken of as a cardiac neurosis. He testified that he did not "believe" Plaintiff's physical condition at the time of the examination would permit him to do the laborious work of a telephone company lineman or trouble shooter. There was evidence that Plaintiff had such work prior to the year 1931. The Doctor stated that from his examination he was not able to form an opinion as to how long the heart condition had existed but that, from the history of the case as given to him by the Plaintiff, the condition began at the time the symptoms began which, according to Plaintiff, was in the year 1931.

Dr. Metzgar, called by the Plaintiff, testified that he first examined the Plaintiff in the month of July, 1932, when he was called to Plaintiff's home to treat him for an intestinal ailment. The Doctor testified that he found what he thought was a heart murmur, and he advised the Plaintiff to avoid working beyond a certain degree, to avoid climbing and stay away from places from which he might fall; that he had examined Plaintiff about twice each year since July, 1932; that early in the year 1933 he changed his opinion as to Plaintiff's condition, concluding that the heart ailment was functional and not organic, and that Plaintiff was suffering from a heart neurosis, which was described as a nervousness of the heart induced by nervous stimuli causing the heart to work irregularly or erratically and causing sweating, pain on little or no exertion, tremor of the hands, a fast heart rate and an anx-

iety about his condition which is not for his best interest; that the Plaintiff was suffering from this condition at the time of the Doctor's last examination which was in February, 1938, and had suffered from it continuously up to that time; that the cause of heart neurosis is over-anxiety or nervous strain, and often occurs after a person is told that there is something wrong with his heart which causes him to worry to such an extent that a nervous condition of the heart occurs.

With respect to the existence of Plaintiff's heart condition prior to November 18, 1931, the date when the insurance policy lapsed for non payment of premiums, Dr. Metzgar was asked the following questions and gave the following answers:

"Q. Doctor, assuming that in May of 1931 the Plaintiff, Harry Peters, suffered from sweating, had a pain in his heart region and which extended up through the left shoulder, down into his arm, had shortness of breath as he testified, I ask you whether in your opinion he suffered at that time from the heart complaint about which you have testified? A. From those factors only I wouldn't be able to express an opinion. However, from the factors he enumerated at the time I first saw him I could. (The second sentence of the answer was stricken out. * * *

"Q. Doctor, I believe you testified that, basing your opinion on the examinations you made of Harry Peters and of the history of the case which you got from him, you were able to form a medical opinion as to when his heart condition first began, did you not? A. I did.

"Q. Now, Doctor, will you state your professional opinion as to when it did begin? A. At least two years prior to my first visit in July, 1932."

The foregoing questions were asked and answered over the objection of counsel for the Defendant.

Relative to the question whether Plaintiff's heart condition was sufficiently severe prior to the lapse of the insurance policy to cause total disability, Dr. Metzgar was asked the following questions and gave the following answers:

"Q. Doctor, it was testified by the Plaintiff, Harry Peters, that he had a grade school education, never went to high school, nor took any further courses, that he went to work in 1914 for the telephone company and worked for them until 1930, first as a lineman's helper for two years, then as a lineman for two years, and then as a trouble shooter with the title of manager for the balance of his employment, doing outside work and not inside work; assuming those facts, I ask you whether in your opinion, based on those facts and your knowledge of his heart condition, whether in your opinion Harry Peters is now able to perform a substantial part of the duties of an occupation which he might otherwise be able to perform? A. The date of my last examination, February, 1938, he was not, no.

"Q. Doctor, you testified, as I remember, that Harry Peters has been suffering since, I think it was July of 1932, from a heart condition, partly functional and partly organic, is that correct? A. That is correct.

"Q. Now, Doctor, the period which he suffered from that disease as you have testified, whether he has been able to perform a substantial part of the duties of an occupation which he might otherwise have been able to perform? A. I can't think of any time since 1932 when he would have been able to perform substantial parts of any gainful occupation and do a full day's work in order to keep up a day's work."

The Doctor then testified, as quoted heretofore, that in his opinion the heart condition existed at least two years prior to July, 1932, and then testified as follows in answer to the following question:

"Q. Now, Doctor, whether or not in your opinion Harry Peters, during the period he had this disease, has been able to perform a substantial part of the duties of an occupation which he might otherwise have been able to perform? A. He could do some few things but not the substantial portion of an occupation."

The provisions of the insurance policy defining total and permanent disability are as follows:

"Total Disability.—Disability shall be considered total when there is any impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation."

"Permanent Disability.—Total Disability shall, during its continuance, be presumed to be permanent;

"(a) If such disability is the result of conditions which render it reasonably cer-

tain that such disability will continue during the remaining lifetime of the Insured; or

"(b) If such disability has existed continuously for ninety days."

After careful consideration of all the evidence, considered in the light most favorable to the Plaintiff, and a thorough study of the authorities, it is my conclusion that Plaintiff did not prove facts sufficient to support a finding that he became totally and permanently disabled prior to November 18, 1931. The first reason for this conclusion is that the only expert testimony tending to establish that Plaintiff was disabled by a heart condition prior to the lapse of the policy was incompetent and the second reason is that, assuming the heart condition existed, the evidence does not show that it was such as to render Plaintiff totally disabled prior to the lapse of the policy.

It is settled by the great weight of authority that, while a lay or non-expert witness may testify as to the apparent physical condition of another which is open to ordinary observation, he may not testify as to the existence, or nature, or character of latent conditions, such as the existence of a particular disease which is discoverable, or its nature or character determinable, only through the particular experience, knowledge, and training of an expert. 93 A.L.R. 482. That a heart disease is one which can be discovered and its nature or character determined only by an expert is beyond dispute. Therefore, the question whether Plaintiff has established the existence of a heart condition sufficiently serious to cause total disability must be determined by an examination of the testimony of his medical experts.

Dr. Shull gave no opinion as to the Plaintiff's condition prior to 1935. Dr. Davis examined Plaintiff only once, in January, 1938, and, although he stated that, if he accepted the history as given to him by the Plaintiff, he thought the heart condition began at the time the symptoms began which, according to the history he received, was in 1931. He was not asked to elaborate on the nature of the history given him and he did not do so. Assuming at present, however, the Doctor's opinion was properly based, it sheds no light on the question whether Plaintiff was totally disabled in 1931. No expert testified that cardiac neurosis in its inception would interfere with a person's ability to perform labor, however strenuous.

Dr. Metzgar, the other expert called by Plaintiff, expressed the opinion that Plaintiff's disability existed at least two years prior to July, 1932, and that during the existence of the disability Plaintiff was not able to perform a substantial part of the duties of an occupation he might otherwise have been able to perform. By the Doctor's own admission, however, as quoted above, his opinion was not based upon his own examination of the Plaintiff or upon the symptoms which Plaintiff testified in Court he experienced in 1931. When asked to give his opinion, based on the symptoms Plaintiff testified to, the Doctor frankly admitted he could not express an opinion from those factors alone. His opinion as finally expressed was based upon the Doctor's own examination coupled with the history of the case as given to him by the Plaintiff and the nature of the history was not revealed.

Both the opinion of Dr. Davis and the opinion of Dr. Metzgar as to the existence of a heart condition prior to the lapse of the policy were incompetent and inadmissible. An expert opinion cannot be based upon facts not before the jury, and, although an expert may base an opinion on an assumed state of facts, which the evidence tends to establish, he may not base it on what some one told him nor on an undisclosed history of the case. Howarth v. Adams Express Co., 269 Pa. 280, 112 A. 536; Johnson v. Valvoline Oil Co., 131 Pa.Super. 266, 200 A. 224.

In this case no doctor who was called by the Plaintiff stated the facts upon which his opinion was based. Dr. Davis stated that he could not give an opinion based on his own examination, and then gave an opinion on the basis of symptoms he said the Plaintiff revealed to him at the time of his examination, but he did not state what those symptoms were. For all that appears, the symptoms revealed to the doctors at that time might have been different from those about which Plaintiff testified at the trial. Plaintiff's counsel made no attempt to have the doctor testify as to what the symptoms were.

Clearly, Dr. Metzgar's opinion was not based upon facts appearing in the record. He frankly stated that he was not able to form an opinion from the symptoms which Plaintiff testified existed in 1931; and then

gave an opinion based, in part at least, upon "the history of the case" he got from the Plaintiff. Here again no attempt was made to disclose what that history was. It might have included many matters not admissible into evidence.

Turning now to Dr. Metzgar's testimony as to the extent of Plaintiff's disability, it amounts to the bare statement that Plaintiff was not able to perform a "substantial part" of an occupation he might otherwise have performed. The statement was not elaborated upon and there is nothing in the record to show what the Plaintiff could have done in 1931 without injury to his health. The doctor seems to have studiously avoided making any detailed statement as to Plaintiff's capacity for work, even at the time of his last examination. The closest he came to such a statement was that Plaintiff could not do a full day's work as a telephone lineman or trouble shooter.

In my opinion, this testimony falls far short of the test established by the Pennsylvania cases. As was said in the case of Cooper v. Metropolitan Life Ins. Co., 317 Pa. 405, 409, 177 A. 43, 44: "It should be clear that disability to engage in any business or occupation does not mean disability merely to carry on the same business or occupation that he had previously been engaged in. * * * A reasonable interpretation of the words of the policy is that the total disability to engage in any occupation or work for compensation or profit which is insured against means inability to perform any of the duties of any occupation which the insured might be ordinarily capable of performing." In the case of Butler v. Metropolitan Life Ins. Co., 122 Pa.Super. 159, 186 A. 395, which followed the Cooper Case, the Plaintiff was clearly unable to drive a coal truck as he had formerly done, but was found capable of managing a coal trucking business, and denied recovery.

In the present case, the doctors were not asked whether Plaintiff could perform "any" of the duties of any occupation he might ordinarily be able to perform, but only whether he could perform a "substantial part" of such duties. The latter test was flatly rejected in Cooper v. Metropolitan Life Ins. Co., supra. Further, the Plaintiff appeared at the trial to be a man of some strength, he was personable and spoke excellent English. Yet, there is no evidence that he ever attempted to work from the time the company, for which he had worked up to 1930, was made a part of the Bell Telephone System. Nobody testified that he was unable to be a salesman or a clerk, or to do other work of a similar nature. He certainly appeared to be a man fully capable of such undertakings and others.

It is my conclusion that there is no competent evidence in the record that Plaintiff was disabled to any substantial degree prior to November 18, 1931, and there is no evidence competent or otherwise, that he was totally disabled within the meaning of the policy in suit prior to November 18, 1931, while the policy was in force. So concluding, the verdict of the jury must be set aside, and judgment entered for the Defendant in accordance with its motion for a directed verdict.

Now, January 14, 1939, Defendant's motion to set aside the verdict and for judgment in accordance with its motion for a directed verdict, filed November 2, 1938, is granted, the verdict in favor of the Plaintiff is set aside, and judgment is directed to be entered in favor of Defendant and against the Plaintiff.

### Supplementary Order.

Now, counsel for Defendant having called our attention to the omission from the Court's opinion and order of January 14, 1939, of reference to Defendant's motion for new trial, for the purpose of making the record complete the Court now adds a finding that the verdict was against the weight of the evidence, but in view of judgment N. O. V. ruling was withheld as unnecessary.