Winters *v.* State Workmen's Insurance Fund
et al., Appellants.

Argued April 17, 1939.

Before KELLER,
P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER,
RHODES and HIRT, JJ.

S. H. Torchia, with him Claude T. Reno, Attorney General, and John T. J. Brennan, for appellants.

George I. Bloom, of Bloom & Bloom, for appellee.

OPINION BY RHODES, J., June 28, 1939:

The issue in this workmen's compensation case is the extent of claimant's disability. Appellants, as stated in their brief, admit "that claimant sustained the injuries complained of and that said injuries resulted in a diminution of vision and further that claimant is entitled to the payment of compensation," but they deny "that he is entitled to compensation for total disability."

On November 14, 1929, claimant and appellants entered into a compensation agreement providing for the payment of compensation at the rate of $15 per week beginning September 26, 1929, and continuing for an indefinite period. On January 12, 1937, the referee made an order reinstating the agreement for total disability beginning January 1, 1931. The referee's order of reinstatement was affirmed by the board and the court below. This appeal followed.

Following a head injury on September 19, 1929, claimant was hospitalized until October 15, 1929. He returned to work on January 7, 1930, a final receipt was filed on January 17, 1930, and he continued to work for nearly a year, when he was discharged. On July 27, 1934, the present petition to set aside the final receipt was filed. Appellant insurance carrier filed an answer on August 18, 1934, but no hearing was held until December 3, 1936. The final receipt was set aside, and

no question relative thereto has been raised on this appeal.

Prior to being injured, claimant worked in appellant employer's coal mine as a loader and driver; thereafter he "ran the pump, scraped the road, scraped dust up and put it in holes around the track," cleaned switches and unloaded sand." During the latter period he worked irregularly due to difficulty with his eyesight. Since losing his job in the mine he has not worked except for a period of three weeks in the spring of 1936, when he was employed by the W. P. A. as a water carrier.

Dr. C. J. McCullough, an expert in diseases of the eye, treated claimant periodically from the day after he was injured until a few months before the hearing. He testified that, when he saw him for the first time, "a study of his visual fields showed that the claimant's peripheral field had been contracted down so that he had what is generally known as tubular vision, that he was unable to see anything except objects that were almost directly in front of the eye or eyes, in other words, he couldn't see anything out of the side, he was totally blind as far as peripheral vision was concerned. He could see as if he was looking through a small tube that was extended out to an indefinite length. At that time his visual fields were between five and ten degrees." At the time of the hearing claimant's visual field was 30 degrees; and the doctor's opinion was that this impairment was permanent, that in time it might be further reduced, but not increased. On June 23, 1930, claimant's visual acuity in each eye was 15/20. By March, 1936, it had diminished, the right eye being 20/40, and the left eye 20/70 minus. On the basis of the Snellen Type Chart, this represented a visual efficiency of 83.6 per cent and 64 per cent minus, respectively. See Skinner's Pennsylvania Workmen's Compensation Law, 2d Ed., p. 272; *Roveran v. Franklinshire Worsted Mills et al.*, 124 Pa. Superior Ct. 119,

122, 188 A. 78. Assuming, as appellants state, that the field of vision—that portion of space which the fixed eye can see—extends at least 90 degrees outword, claimant had lost two-thirds of his field of vision. The testimony on this subject could have been more specific and illuminating. Dr. McCullough testified further: "Q. In your opinion, in January, 1930, when you saw him, what would you say as to his disability at that time? A. I would say he was totally disabled as far as industrial employment was concerned. Q. Now, doctor, the different times that you have seen him, would you say that disability has continued that of total disability? A. Yes, it has continued up until the time of my last visual field study in February of this year. Q. Doctor, knowing William Winters, such as you do, would you say that there has been such an impairment, sufficient to disqualify him from employment for which he is manually and physically qualified? A. Absolutely. Q. And is that disability total disability, in your opinion? A. It is total and permanent." The only relevant finding of fact of the referee was based on the doctor's testimony, and is as follows: "Tenth: That Dr. C. J. McCullough was called as a medical witness for the claimant, who testified that in his opinion, at the time the claimant returned to work the visual acuity of the claimant was such that he believed him totally disabled, industrially. He further testified that the claimant's visual acuity and visual fields have decreased to such an extent as to render the claimant totally disabled for industrial purposes. ......"

The question whether disability is total or partial is one of fact to be determined by the compensation authorities (*Byerly v. Pawnee Coal Co. et al.*, 105 Pa. Superior Ct. 506, 508, 161 A. 460), and our review is confined to ascertaining whether or not the finding of fact so made is based on legally competent evidence

*(Reckner v. General Water Co. et al.,* 131 Pa. Superior Ct. 538, 542, 200 A. 297).

The compensation authorities made no finding, and it does not appear from the testimony, that claimant has suffered the permanent loss of the use of either eye. The capacity for sight is unquestionably seriously impaired, but the sight in neither eye has been entirely destroyed. Appellants admit that, as a result of the diminution of vision, claimant is entitled to compensation for partial disability, but not for total. Consequently, "the proper test is not whether the claimant is able to do exactly the same kind of work as he did before the injury, but whether his earning power is entirely destroyed so that he cannot obtain remunerative employment. See Schneider's Workmen's Compensation Law, vol. 2, 2d Ed., §418, and 28 R. C. L. 820, par. 106, and the numerous cases there cited. Mr. Justice [now Chief Justice] KEPHART, in *Woodward v. Pittsburgh Eng. & Const. Co.,* 293 Pa. 338 [143 A. 21], states that disability contemplated by our law is the loss of earning power as the result of the injury": *Byerly v. Pawnee Coal Co. et al.,* supra, 105 Pa. Superior Ct. 506, at page 508, 161 A. 460. Earning power is to be estimated by considering not only the actual amount of wages received following an injury but also (1) the character and extent of the physical injury or disability; (2) the claimant's productivity or efficiency in the same employment as compared to what it was immediately prior to the injury; and (3) his ability to earn wages in any kind of employment for which he is fitted. *Bispels v. Charles R. Shoemaker, Inc., et al.,* 133 Pa. Superior Ct. 117, 2 A. 2d 35. In the case at bar, the evidence covers the first two elements mentioned, but we think it is insufficient as to the third. There is nothing to show what kind of work claimant is fitted to perform, and that the condition of his eyes prevents him from doing or obtaining work "for which he is

mentally and physically qualified": *Fillip v. Wm. Cramp & Sons Ship & Engine Building Co. et al.*, 80 Pa. Superior Ct. 68, at page 72. For example, in *Eckley v. Rae*, 128 Pa. Superior Ct. 577, at page 581, 194 A. 575, at page 577, in addition to the medical testimony, it was shown that claimant "was unable to do any work that required him to be on his feet or to obtain employment. The only way he got relief was by sitting down and elevating his feet. The claimant had a very limited education, stopping school at 14 years of age when he had finished the third grade, and, with the exception of a few years thereafter when he did general labor work, his employment had been that of a structural steel worker. The testimony indicates that, mentally, he is not qualified to do any work except as a laborer and his physical disability prohibits that form of employment, except to a very limited degree." We there held that by this and the medical testimony claimant had carried the burden of showing that he was physically unable to work as a result of the accident. In the present case there is no testimony as to claimant's total disability except the opinion of the medical expert, which opinion has no such factual basis in the record.

In *Cavanaugh v. Luckenbach Steamship Co.*, 125 Pa. Superior Ct. 275, at page 278, 189 A. 789, at page 791, we said, speaking through Judge PARKER: "There is sufficient evidence to support the finding of the workmen's compensation board that this claimant suffered a diminution of earning power. The physician called by the defendant admitted that the earning power of the claimant had been reduced by from 20 to 25 per cent., while claimant's physician fixed it at 75 per cent. This, taken with a description by the claimant himself of his physical condition and testimony as to the work he was fitted to perform, furnished a legitimate base for the conclusion of the board."

As we understand the testimony, claimant's visual efficiency is not so low as of itself to cause total disability, as, outside of his peripheral vision, he had a visual acuity of 20/40 and 20/70 minus in the right and left eye, respectively.

We think it is significant that claimant, after his injury, worked in the mines for approximately a year, or from January 7, 1930, to about January 1, 1931. During a portion of this time, it would seem from the testimony, claimant's eye condition must have been about the same as it was on April 16, 1931, and on February 20, 1936. In this connection Dr. McCullough testified: "Immediately following the accident the visual field in either eye was approximately five to ten degrees, within a period of sixty to ninety days the visual field had expanded to its normal size, approximately, within the following six to nine months it had gone back to thirty degrees. It has remained stationary at approximately thirty degrees since that time." At the examinations on April 16, 1931, and February 20, 1936, the field of vision in both eyes was reduced to 30 degrees. Claimant himself testified that his eyes were bad during the time that he worked subsequent to his accident, and that their condition prevented him from working every day, thus indicating that his eyes were not normal during the time that he was employed subsequent to his accident.

Notwithstanding his testimony and that of claimant, the medical expert concluded that claimant was totally disabled. Apparently whatever disability claimant has is due to the limitation of peripheral vision, which is performed by parts of the retina outside of the macula lutea. If his eyesight is otherwise usable, there may be many things that he could do where the impairment of the indirect vision would be little or no handicap. Whether or not he is fitted for any occupations except those in which the impairment of his vision would be a total bar is precisely what the record fails to disclose.

As the testimony previously quoted shows, Dr. Mc-Cullough was asked to express an opinion "knowing William Winters, such as you do." How the doctor knew the claimant we do not know, for the record is silent on the subject. However, there was no evidence to show for what employment claimant was "manually [mentally] and physically qualified." We recently reiterated the rule that the opinion of an expert may be based on an assumed state of facts which the evidence tends to establish, but not on matters which do not appear in the record. *Johnson v. Valvoline Oil Co. et al.,* 131 Pa. Superior Ct. 266, 271, 200 A. 224. See, also, *Troxell v. Shirk et al.,* 130 Pa. Superior Ct. 40, 48, 196 A. 899; *Harmon v. Knoll,* 129 Pa. Superior Ct. 390, 393, 195 A. 448; *Knisely v. Knisely,* 120 Pa. Superior Ct. 140, 148, 182 A. 51. The doctor may have an intimate knowledge of claimant's qualification for employment, but he may not, by adding that unknown factor to his premise, be permitted to express the ultimate conclusion. The final determination is the prerogative of the fact-finding body, in this case the referee and board. " 'Medical authorities can testify in compensation cases as to the results of the injuries received by the claimant, describing them in detail, their duration, and what the probable effects will be on the man's earning power, so that the referee may have before him for his assistance in finding the facts in the case all that will prove the result of these injuries. If the physicians so testifying have put before the referee facts on which they can base a conclusion as to what proportion of the earning capacity of a man has been affected by the injury to him, they can express that conclusion' ": *Harmon v. Knoll,* supra, 129 Pa. Superior Ct. 390, at page 393, 195 A. 448, at page 449. This is not to be confused with the contention that expert testimony usurps the functions of the fact-finding body, which was rejected by this court in *Becker v. Prudential Insurance Co. of*

*America,* 124 Pa. Superior Ct. 138, 142, 188 A. 400, and by the Supreme Court in *Cooper v. Metropolitan Life Ins. Co.,* 323 Pa. 295, 186 A. 125.

It may be that, when the evidence which we deem essential to a proper determination of the issue has been adduced, the compensation authorities will arrive at the same conclusion. But the record now before us lacks the evidential support required by the order.

The order of the court below is reversed, and it is directed that the record be returned to the Workmen's Compensation Board for further action not inconsistent with this opinion.